T.C. Memo. 2012-173

UNITED STATES TAX COURT

ESTATE OF ALFRED J. RICHARD, DECEASED, GARY H. RICHARD AND
PETER C. RICHARD, CO-EXECUTORS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9876-09.                    Filed June 20, 2012.

<u>Eric M. Kramer</u>, <u>John J. Barnosky</u>, <u>Joseph T. La Ferlita</u>, and <u>Louis Vlahos</u>,

for petitioners.

<u>Donald Alan Glasel</u> and <u>Marissa J. Savit</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined a $68,141,250 deficiency in Federal

estate tax for the Estate of Alfred J. Richard (estate).  Respondent also determined

penalties under section 6662[1] of $27,160,896. Some issues in this case have been separated for purposes of trial and opinion. The issue for decision in this opinion is whether 740 or 600 shares of preferred stock in A.J. Richard & Sons, Inc. (A.J. Richard & Sons), should be included in the estate. We hold that only 600 shares should be included in the estate.

## FINDINGS OF FACT

Alfred J. Richard (decedent) was a resident of Florida when he died on December 28, 2004. His sons, Gary H. Richard and Peter C. Richard, are coexecutors of his estate and were residents of New York at the time the petition was filed.

A.J. Richard & Sons was incorporated in New York on February 1, 1977. A.J. Richard & Sons is a holding corporation which owns and oversees the activities of various subsidiaries. As of February 1, 1977, there were 3,000 outstanding common shares in A.J. Richard & Sons. Of those shares decedent owned 1,311 shares, decedent's spouse, Victoria Richard, owned 300 shares, Gary Richard owned 694.5 shares, and Peter Richard owned 694.5 shares.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death.

Pursuant to an amendment to A.J. Richard & Sons' certificate of incorporation dated July 1, 1981, and an agreement dated July 1, 1981, by and between decedent, Mrs. Richard, and the corporation, some of the corporate stock was recapitalized. On August 21, 1981, decedent and Mrs. Richard exchanged all of their common stock for class A preferred stock.[2] As a result, 600 shares of class A preferred stock were issued to decedent, and 140 shares of class A preferred stock were issued to Mrs. Richard. Gary and Peter Richard each retained 694.5 shares of common stock in A.J. Richard & Sons. Decedent and Mrs. Richard never elected to convert their class A preferred stock into class B preferred stock, no additional shares of common stock or preferred stock were issued during decedent's lifetime,[3] and no dividend distributions have ever been paid on the preferred stock.

Mrs. Richard passed away on October 15, 1997. She was a Florida domiciliary and resident at the time of her death. Although Mrs. Richard executed a

---

[2]Each share of class A preferred stock has a par and redemption value of $1,000, is 8% noncumulative, has voting rights, and is convertible at the option of its holder into an equal number of shares of class B 15% cumulative, nonvoting preferred stock. Class A preferred stock shares carry equal voting rights, per share, to those of common stock.

[3]While no other shares of stock were issued during decedent's lifetime, at some point during decedent's lifetime Gary and Peter Richard transferred 244.3 shares each to holding trusts for the benefit of decedent's grandchildren.

will on March 28, 1991, the will was not offered for probate until November 2010.[4]

No Federal or State estate tax returns were ever filed on behalf of Mrs. Richard's estate, and no intestacy proceeding or probate of any other will (if Mrs. Richard had more than one will) took place before 2010.[5] The probate of Mrs. Richard's will is described further below.

At the time of decedent's death in December 2004 decedent was the chairman of A.J. Richard & Sons' board of directors, and Gary and Peter Richard were the only other directors. At that time the officers of A.J. Richard & Sons and the various operating subsidiaries included Gary and Peter Richard, but not decedent.

---

[4]The will had been stored in a vault in an attorney's office for many years and was not retrieved until September 2010. It appears that upon Mrs. Richard's death most persons did not know of the will and assumed decedent inherited all her assets in intestacy. No one who knew of the will's existence before September 2010 supplied information relating to it for purposes of this case. Although Gary and Peter Richard were named coexecutors under Mrs. Richard's will, before September 2010 they were never informed by their mother, decedent, or anyone else that the will existed. Thus, they were not aware that they had been named the personal representatives of Mrs. Richard's estate and did not seek to have the will probated until they discovered the will's existence in 2010.

[5]This finding is based on testimony that until 2010 Gary and Peter Richard were unaware their mother had any will as well as the fact that ownership of Mrs. Richard's preferred stock shares was not transferred as it would have been had an intestacy proceeding taken place before her will was probated in 2010.

After decedent's death, Gary and Peter Richard asked Thomas Pohmer, A.J. Richard & Sons' chief financial officer, to cooperate with counsel for the estate in preparing the Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, for the estate. Mr. Pohmer told counsel for the estate that Mrs. Richard's 140 shares of class A preferred stock (140 shares) had passed to decedent because he assumed the shares had passed to decedent upon Mrs. Richard's death.[6] However, at the time of decedent's death, record title to the 140 shares remained in Mrs. Richard's name on A.J. Richard & Sons' preferred stock ledger. There were no shareholder meetings or votes at which the 140 shares could have been voted between the dates of Mrs. Richard's death and decedent's death.

The Form 706 filed by the estate in March 2006 reported that decedent owned 740 shares of preferred stock (740 preferred shares) in A.J. Richard & Sons at the time of his death. Gary and Peter Richard signed the Form 706, as did John Barnosky of the law firm Farrell Fritz, P.C., the law firm representing petitioners in

---

[6]In a letter dated October 5, 2010, to respondent's counsel, one of petitioners' representatives stated that the firm representing petitioners "surmised, because all of the other properties owned by the decedent and Victoria were held jointly with survivorship rights, that her family assumed that the same was true of the preferred stock". Insufficient evidence and testimony were provided for us to determine whether decedent's family or acquaintances actually assumed the 140 shares had been jointly owned by decedent and Mrs. Richard.

this case. The Form 706 reported the value of the 740 preferred shares at $740,000, representing the number of shares believed to have been owned by decedent multiplied by the $1,000 par and redemption value of each share.

Decedent died testate. On September 28, 2005, a petition for administration was filed in the Probate Division of the Circuit Court in St. Lucie County, Florida, which sought to have decedent's will probated. In October 2005 petitioners filed a notice to creditors in the probate proceeding, and in May 2006 an inventory of decedent's estate was filed which included the 740 preferred shares believed to have been owned by decedent. The will was admitted to probate, and all of decedent's assets were distributed according to the instructions in his will.[7]

An appraisal of the 740 preferred shares on behalf of the Internal Revenue Service in August 2008 found the value of the 740 preferred shares to be $142,203,000 as of the date of decedent's death.[8] On March 5, 2009, respondent issued a notice of deficiency determining that petitioners had undervalued the 740 preferred shares reportedly owned by decedent at the time of his death.

---

[7]Some of decedent's assets were used to pay various funeral and estate expenses. The remainder was bequeathed to a trust established in 1991.

[8]Respondent's expert determined that the shares were worth $142,203,000 because the 740 preferred shares constituted over one-third of the voting shares in A.J. Richard & Sons, sufficient to block any major change from occurring to the corporation.

Respondent determined a deficiency of $68,141,250 and penalties under section 6662 of $27,160,896. The estate timely filed a petition contesting the deficiency, asserting that the value of the preferred stock owned by decedent was only $740,000.

The rediscovery of Mrs. Richard's will in September 2010 raised the issue of whether decedent's estate representatives properly included the 140 shares in the estate, or whether the 140 shares should have been included in Mrs. Richard's estate and thereafter passed to a credit shelter trust created by Mrs. Richard's will.[9] A copy of Mrs. Richard's will was submitted to respondent in October 2010, and the will was offered for probate in the Circuit Court for St. Lucie County, Florida (St. Lucie circuit court), in November 2010. The documents filed with the St. Lucie

---

[9]Mrs. Richard's will directed that the credit shelter trust "shall terminate at the death of my husband, whereupon my trustees shall distribute the then principal thereof to my then living issue, per stirpes." Mrs. Richard's will further stated that "I am the owner of preferred shares of stock in A.J. Richard & Sons, Inc. Upon my death if my husband shall have predeceased me, or upon his death if he survives me, I direct my Personal Representatives or trustees, as the case may be, to sell or redeem such shares." The 140 shares were never sold or redeemed. Rather, the 140 shares were divided evenly and distributed to Gary and Peter Richard.

circuit court state that the preferred stock previously owned by Mrs. Richard is the only asset of her estate.[10]

On November 22, 2010, petitioners filed with this Court a motion for leave to amend petition requesting that they be permitted to amend their petition to challenge the inclusion of the 140 shares in decedent's estate. On December 16, 2010, the St. Lucie circuit court issued an order admitting Mrs. Richard's will to probate and appointing Gary and Peter Richard as personal representatives of her estate, as her will had directed. On January 6, 2011, we granted petitioners' motion for leave to amend petition and filed the amendment the same day. In the amendment petitioners allege that decedent owned only 600 shares of preferred stock in A.J. Richard & Sons at the time of his death and that the value of those shares was only $600,000 at the time of decedent's death.

---

[10]Testimony established that Mrs. Richard owned an automobile and jewelry during her life, but no other evidence was presented regarding what became of these assets upon (or before) her death. Mrs. Richard's will specifically bequeathed all her jewelry and the automobile to decedent if he survived her (which he did).

OPINION

## I.  Burden of Proof

In general, the burden of proof with regard to factual matters rests with the taxpayer.  Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue.  Because we decide this issue on the basis of the preponderance of the evidence, we need not decide upon which party the burden rests.

## II.  Proper Estate for Inclusion of the 140 Shares

Respondent does not contest the validity of Mrs. Richard's will but makes several arguments that probate of her will does not affect the 140 shares which had already been included in decedent's estate and were distributed according to the instructions in his will.  Respondent argues that the shares are more properly included in decedent's estate as opposed to Mrs. Richard's estate.  In support of this argument, respondent claims that "the lack of formal ownership transfer [of

the 140 shares to decedent] is inconsequential" and that the shares "were never owned by or includable in Victoria's estate."[11] We disagree.

Florida law governs the ownership of legal title to the 140 shares at issue. The Supreme Court of the United States has held that--

> State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed. Our duty is to ascertain the meaning of the words used to specify the thing taxed. If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law.

Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940). In applying this rule, we have observed that in determining a decedent's interest in property, "we look to State law. 'State law, which creates legal interests and rights in property, including powers of appointment, determines the nature, scope, and validity of such legal interests and rights.'" Estate of Fortunato v. Commissioner, T.C. Memo. 2010-105 (quoting Estate of Posner v. Commissioner, T.C. Memo. 2004-112). As a Federal court, we are not bound by the decision of a State trial court (such as the St. Lucie circuit court, which admitted Mrs. Richard's will to probate) unless the

---

[11]Respondent's argument on this point is somewhat unclear. It appears to be based on a theory of estoppel: that as a result of various actions taken (and beliefs held) by the parties involved, decedent's estate should now be barred from denying decedent's ownership of the 140 shares and including the shares in Mrs. Richard's estate.

decision was affirmed by the State's highest court. Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967).

At the time of Mrs. Richard's death, Fla. Stat. Ann. sec. 732.514 provided that "The death of the testator is the event that vests the right to devises unless the testator in his or her will has provided that some other event must happen before a devise shall vest."[12]  Fla. Stat. Ann. sec. 731.201(10) (West 2010) provides that the term "'Devise,' when used as a noun, means a testamentary disposition of real or personal property."[13]  Courts have consistently held under these and similar statutes[14] that title to property bequeathed in a probated will is deemed to have passed to a devisee upon the death of the testator, regardless of when the will is probated.  See Estate of Bagley v. United States, 443 F.2d 1266, 1269 (5th Cir.

---

[12]The statute has not been substantially altered in the years since Mrs. Richard's death.  It currently provides that "The death of the testator is the event that vests the right to devises unless the testator in the will has provided that some other event must happen before a devise vests."  Fla. Stat. Ann. sec. 732.514 (West 2010).

[13]This was true both at the time of Mrs. Richard's death and today, although at the time of Mrs. Richard's death the term was defined in Fla. Stat. Ann. sec. 731.201(8).

[14]The precursor to Fla. Stat. Ann. sec. 732.514 was Fla. Stat. Ann. sec. 731.21, which provided that "The death of the testator is the event which vests the right to legacies or devises unless the testator in his will has provided that some other event must happen before a legacy or devise shall vest."

1971) ("In sum, the power of appointment, like a legacy or devise, is inchoate pending probate and dates back to the date of death upon probate. * * * The power of appointment given to * * * [the devisee] under her husband's will was created immediately upon the death of the husband, subject to later perfection by probate."); United States v. 936.71 Acres of Land, 418 F.2d 551, 554 (5th Cir. 1969) (husband died in 1953; although his will bequeathing all his property to his wife was not probated until 1966, "the passage of title [to wife] under the will dated back to the time of her husband's death"); Rice v. Greene, 941 So. 2d 1230, 1231 (Fla. Dist. Ct. App. 2006) (wife of deceased husband conveyed the same real property left to her in husband's will to two parties and litigation ensued; regarding wife's holding title in the property, the court noted that husband's death "vested * * * [wife's] rights in the property. * * * [I]t is clear that because * * * [wife] never offered * * * [husband's] will for probate, she lacked marketable title to the property. However, she clearly acquired equitable title to the property upon her husband's death".).

Respondent claims that Fla. Stat. Ann. sec. 732.514 is not determinative of ownership of the 140 shares because decedent became the owner of the shares after the death of his wife, despite the lack of formal transfer of ownership

to him.[15]  Citing Commissioner v. Estate of Bosch, 387 U.S. 456, respondent correctly asserts that we may decide in which estate the 140 shares should have been included because the decision of the St. Lucie circuit court admitting Mrs. Richard's will to probate was not affirmed by the highest court in Florida. Respondent then argues that given the facts of this case, we should hold that the 140 shares are more properly includable in decedent's estate.  However, upon a review of the facts, we find that decedent never owned the 140 shares and that it is more proper to include the shares in Mrs. Richard's estate.

Respondent claims that "if the Decedent sought to change the name on the 140 shares, vote those 140 shares, or transfer them, he would have been permitted to do so since all the other shareholders believed he owned them."  While it is possible that respondent's hypotheticals might have happened, they did not.  In fact, title to the shares remained in Mrs. Richard's name from the time of her death until the death of decedent, and decedent never took any overt action to indicate that he was the owner of the shares.[16]  We believe these facts are evidence that the shares

---

[15]Respondent hints that decedent became the "owner" of the shares through misappropriation.

[16]Respondent points out that decedent signed above Mrs. Richard's name (as well as above his own name) on a Certified Resolution for A.J. Richard & Sons in 2001 and claims this is evidence that decedent acted as the owner of Mrs.

(continued...)

were not misappropriated by decedent or otherwise transferred to him. Indeed, we believe these facts support the view that decedent never owned the shares (regardless of what those around him may have believed) and that decedent took no actions which were inconsistent with the terms of Mrs. Richard's will. Decedent did nothing to cause the 140 shares to be included in his estate; rather, the personal representatives of his estate mistakenly believed decedent owned the shares and listed the shares as part of the estate's inventory after decedent's death.

Respondent repeatedly faults Gary and Peter Richard for actions they failed to take as representatives of Mrs. Richard's estate. Respondent claims that "For more than thirteen years the fiduciaries did nothing until they, themselves, stood to lose financially" and that "Gary and Peter, as their mother's estate's personal representatives and as officers of the Corporation, had the ability to change the name on the stock certificates. * * * They had the responsibility to gather her estate's assets in 1997 and would have known of their existence." However, we

---

[16](...continued)
Richard's shares. The resolution concerns corporate business such as a lease, a sublease, and a letter of representation, makes no mention of corporate shareholders, and provides that the resolutions contained therein were "adopted by unanimous consent of directors in lieu of meeting". In addition, the area for signatures on the document is prefaced "Directors consent". Although two of the signatures were those of persons who were shareholders but not directors, we believe it more likely that decedent signed the document in his capacity as a director of the corporation rather than in his capacity as a corporate shareholder.

have found that Gary and Peter Richard did not seek to have Mrs. Richard's will probated sooner because they were not aware that the will existed until September 2010. Indeed, once they learned of the existence of Mrs. Richard's will, Gary and Peter Richard promptly sought to have it probated.

Respondent also faults Gary and Peter Richard for other actions they took (or failed to take). First, respondent faults them for including only the 140 shares in the inventory of Mrs. Richard's estate, ignoring other assets she may have owned at the time of her death, such as jewelry and an automobile. Second, respondent faults them for failing to sell the 140 shares or have them redeemed by A.J. Richard & Sons as directed by Mrs. Richard's will.[17] Finally, respondent alleges Gary and Peter Richard, among others, violated New York State law by failing to hold annual shareholder meetings for A.J. Richard & Sons at which the preferred shares might have been voted between Mrs. Richard's and decedent's deaths.

We do not believe these actions are sufficient to require assigning the shares to decedent's estate instead of Mrs. Richard's. First, the allegation that Gary and Peter Richard may have failed to include certain other assets in Mrs. Richard's

---

[17]Petitioners claim on brief that they tried to have the shares redeemed and that the corporation refused. Insufficient evidence was presented for us to determine whether petitioners actually tried to have the shares redeemed.

estate does not mean that inclusion of the 140 shares was improper. Failure to include jewelry, an automobile, or other assets may be an issue to be addressed in another case. Similarly, the fact that the shares were not sold may reflect a breach of a fiduciary duty to be addressed in another case and forum but does not mean that the shares were not properly included in Mrs. Richard's estate. Finally, we see no connection between failure to hold shareholder meetings for a closely held family-owned corporation such as A.J. Richard & Sons and any nefarious plans regarding the 140 shares. Indeed, Gary and Peter Richard were not aware of Mrs. Richard's will until 2010, logically eliminating the possibility of their participation in any earlier planning regarding the 140 shares.

Considering the preceding facts and arguments, we find that upon probate of Mrs. Richard's will in 2010 the passage of title to the 140 shares to the credit shelter trust dated back to the time of Mrs. Richard's death in 1997.[18] We further find that no actions were taken from the time of Mrs. Richard's death to the probate

---

[18]It was not clear from the evidence provided whether the 140 shares were ever actually transferred to the credit shelter trust before being distributed to Gary and Peter Richard. However, respondent did not make any arguments regarding transfer of the 140 shares to the credit shelter trust, and we therefore deem this potential issue to be waived by respondent. See Muhich v. Commissioner, 238 F.3d 860, 864 n.10 (7th Cir. 2001) (issues not addressed or developed are deemed waived--it is not the Court's obligation to research and construct the parties' arguments), aff'g T.C. Memo. 1999-192.

of her will which changed ownership of the 140 shares or which would make it more proper for the shares to be included in decedent's estate rather than Mrs. Richard's estate.

III.  Florida Statute of Limitations and Statute of Nonclaim

Fla. Stat. Ann. sec. 733.702(1) (West 2010) provides, in part--

no claim or demand against the decedent's estate that arose before the death of the decedent, including claims of the state and any of its political subdivisions, even if the claims are unmatured, contingent, or unliquidated; no claim for funeral or burial expenses; no claim for personal property in the possession of the personal representative; and no claim for damages, including, but not limited to, an action founded on fraud or another wrongful act or omission of the decedent, is binding on the estate, on the personal representative, or on any beneficiary unless filed in the probate proceeding on or before the later of the date that is 3 months after the time of the first publication of the notice to creditors or, as to any creditor required to be served with a copy of the notice to creditors, 30 days after the date of service on the creditor, even though the personal representative has recognized the claim or demand by paying a part of it or interest on it or otherwise. The personal representative may settle in full any claim without the necessity of the claim being filed when the settlement has been approved by the interested persons.

Fla. Stat. Ann. sec. 733.710(1) (West 2010) provides in pertinent part that "Notwithstanding any other provision of the code, 2 years after the death of a person, neither the decedent's estate, the personal representative, if any, nor the beneficiaries shall be liable for any claim or cause of action against the decedent".

Respondent claims that "Since petitioners are seeking to remove an asset from the Decedent's probate estate, they are bound by the provisions of [Fla. Stat. Ann.] sections 733.702 and 733.710." Respondent argues that both statutes prevent petitioners from moving an asset from decedent's estate and placing it in Mrs. Richard's estate. We disagree, finding that neither statute applies in this case.

Florida State appellate courts have consistently held that a claim and liability arising after a decedent's death is not subject to Fla. Stat. Ann. secs. 733.702 and 733.710.[19] Joseph v. Estate of Joseph, 83 So. 3d 965, 969-970 (Fla. Dist. Ct. App. 2012); Coba v. Craig, 881 So. 2d 733 (Fla. Dist. Ct. App. 2004); Thompson v. Hodson, 825 So. 2d 941, 948 (Fla. Dist. Ct. App. 2002); Swenszkowski v. Compton, 662 So. 2d 722, 723 (Fla. Dist. Ct. App. 1995) (citing In re Estate of Kulow, 439 So. 2d 280, 282 (Fla. Dist. Ct. App. 1983)). Although under Commissioner v. Estate of Bosch, 387 U.S. 456, we are not bound to follow

_____

[19]A statutory exception is made for claims for funeral and burial expenses. See Fla. Stat. Ann. secs. 731.201(4) ("'Claim' means a liability of the decedent, whether arising in contract, tort, or otherwise, and funeral expense. The term does not include an expense of administration or estate, inheritance, succession, or other death taxes."), 733.702(1) (West 2010) (specifically mentioning claims "for funeral or burial expenses" ).

decisions of the Florida State appellate courts, we find their interpretation of Fla. Stat. Ann. secs. 733.702 and 733.710 persuasive and adopt it.

As discussed supra, decedent did nothing to cause the 140 shares to be included in his estate. Rather, the personal representatives of his estate mistakenly believed decedent owned the shares and listed the shares as part of decedent's estate after his death. Thus, no claim against decedent's estate by Mrs. Richard's estate arose during decedent's lifetime and any claim by Mrs. Richard's estate for the 140 shares is not subject to Fla. Stat. Ann. secs. 733.702 and 733.710. As a result, respondent's argument on this point fails.

IV. Dominion and Control of the 140 Shares

Respondent argues that even if decedent did not own the 140 shares, they are still includable in his estate because he exercised dominion and control over them. In support of this argument, respondent again brings up several of the points we have previously addressed, such as the fact that the shares were listed in the inventory of decedent's estate, that other owners and directors of A.J. Richard & Sons believed decedent owned the shares, and that decedent signed above Mrs. Richard's name on a certified resolution for A.J. Richard & Sons in 2001.[20]

---

[20]As previously discussed, we have found that Mr. Richard signed this corporate resolution in his capacity as a director of the corporation, as opposed to a

(continued...)

However, we believe these facts (most of which stemmed from the mistaken beliefs of persons other than decedent) do not provide a great deal of support for respondent's argument. Indeed, we believe the facts, including decedent's lack of action in seeking to vote, transfer, or otherwise benefit from the 140 shares, more strongly support petitioners' argument that decedent never exercised dominion or control over the shares. Perhaps most importantly, we note that as of decedent's death, title to the 140 shares remained in Mrs. Richard's name on A.J. Richard & Sons' preferred stock ledger.

After considering the evidence presented, we find that decedent never exercised dominion and control over the 140 shares in issue. Respondent's argument on this point thus fails.

V. <u>Whether the Position Taken by Petitioners on the Form 706 Filed by the Estate Is Binding</u>

The Form 706 filed by the estate reported that at the time of his death decedent owned 740 preferred shares (the 140 shares plus the 600 shares decedent had owned since 1981). Positions taken in a tax return signed by a taxpayer or return preparer may be treated as admissions, and the taxpayer or return preparer cannot disavow returns he or she prepared without cogent proof that they are

---

[20](...continued)
corporate shareholder.

incorrect. Mendes v. Commissioner, 121 T.C. 308, 312 (2003); Kaltreider v. Commissioner, 28 T.C. 121, 125-126 (1957), aff'd, 255 F.2d 833 (3d Cir. 1958); Crigler v. Commissioner, T.C. Memo. 2003-93, aff'd, 85 Fed. Appx. 328 (4th Cir. 2004). Respondent argues that petitioners failed to supply cogent proof that the 140 shares in issue were not owned by decedent and are thus bound by the position reported in the filed Form 706. We disagree.

We believe that the rediscovery of Mrs. Richard's will in 2010, its admission to probate (which under Florida law causes the credit shelter trust's ownership of the 140 shares to date back to the date of Mrs. Richard's death), and other facts previously discussed in this opinion constitute cogent proof that the 140 shares were not owned by decedent at the time of his death and were incorrectly included in decedent's estate on the Form 706. As a result, petitioners are not bound by the position taken on the filed Form 706.

VI. Conclusion

We hold that 140 of the 740 preferred shares included in decedent's estate on the Form 706 were not properly included in decedent's estate. Rather, the 140 shares were more properly includable in Mrs. Richard's estate.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate order will be issued.