T.C. Memo. 2012-38

UNITED STATES TAX COURT

STEVEN A. ESRIG, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

STEVEN A. ESRIG AND LORI S. ESRIG, Petitioners v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 18797-03, 16806-08.          Filed February 7, 2012.


Steven A. Esrig and Lori S. Esrig, pro se.

Bradley C. Plovan, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:   Steven and Lori Esrig didn't timely file their tax returns for any year from 1998 through 2003.  For some years they were so late that the Commissioner prepared substitute returns for them,[1] and for all those years he sent them notices of deficiency.  But the Esrigs claim the Commissioner got it all wrong, that they don't owe any taxes, additions to tax, or penalties because they were involved in a number of businesses for which, in total, they have more losses and deductions than income.  The case is all about substantiation, and we therefore must decide whether the Esrigs have substantiated their claimed losses and deductions, and then figure out how much they owe in taxes, additions to tax, and penalties, if any.

---

[1] When the Commissioner learns that someone has received income--usually from third parties under a duty to report--but has not filed a return, section 6020(b) gives him the power to prepare a "substitute for return" (SFR).  An SFR is not a comprehensive return; the Commissioner uses only one of the two filing statuses-- single or married filing separately--and he allows only one personal exemption and no business expenses or personal deductions.  <u>See</u> Internal Revenue Manual pt. 4.19.17.1.3.1 (Nov. 10, 2006).  (Unless we say otherwise, all section references are to the Internal Revenue Code in effect for the years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.)

FINDINGS OF FACT

Steven and Lori Esrig earned much of their income from real-estate sales and investments in securities. Lori was licensed as a real-estate broker,[2] and had her own business buying and selling real estate for others. Steven was an entrepreneur.

Sometime before 1998, the Esrigs decided to go into business together, starting SEC Financial Services, Inc.--a company Steven said rented, renovated, and repaired properties owned by the Esrigs, and even some owned by others. Steven explained that Lori bought, sold, and rented out the real estate, but he himself handled the day-to-day maintenance and repair work. He also claimed that SEC produced income from the rent they received and the repair work SEC's crew performed for other property owners.

Steven testified that SEC had one full-time employee who helped out, and from time to time he would also "hire either college students or other part-time renovation tradesmen, electricians, carpenters, plumbers, [and] that type of thing." He claimed that SEC didn't actually pay the student workers, but that they did

---

[2] A licensed real-estate broker has to complete more coursework than a licensed real-estate agent. In most states, a real-estate agent must be supervised by a broker. Selling real estate independently often requires a broker's license.

cleanup work in exchange for a discount on their rent. SEC did pay its subcontractors, however, and Steven said that he kept records of how much he paid and to whom. He also said that he and his wife kept calendar records of the time they spent doing work for SEC. But even though he said all this, he actually introduced no supporting documents or other proof of SEC's expenses.

By early 2002 the Esrigs were out of the real-estate rental and repair business and had sold off all their rental properties. Lori still had her real-estate sales business, but Steven started a new company called Stelor Productions, Inc. (He chose the name "Stelor" because it was a portmanteau of Steven and Lori.)

Steven told us at trial that he got the idea for the company after an incident involving one of his children. Apparently, his then-five-year-old child asked to look at the Power Rangers website. Steven logged on but inadvertently mistyped a character in the web address. Instead of getting the Power Rangers website, up popped a seriously pornographic one. This, he told us, was the reason he started Stelor, a company he claims invented a technology that protects children from predators and pornography and "shuts down identity theft." We find, however, that much of Steven's trial testimony was not credible, and this particular tale we believe to be nothing more than a pourquoi story.

What we do find is that Stelor operated out of the Esrigs' home in Darnestown, Maryland, and even paid some rent: $3,600 in 2002, and $68,400 in 2003. Steven was the president and CEO of the company; and Stelor did have a board of directors and several other investors.

Stelor, however, never made any money and lost most (if not all) of what the investors put in. Steven told us that the company failed because it "ran into some litigation" after it bought the domain name "googles.com" from someone who had it before Google. This, he said, led to five or six years of litigation with Google and ultimately bankrupted his company.[3]

---

[3] Some background from the public record: Sometime before August 1997, Steven A. Silvers, a convicted narcotics trafficker and money launderer, wrote a children's book about loveable four-eyed alien creatures called "Googles" who live on the planet Goo. See United States v. Silvers, 90 F.3d 95 (4th Cir. 1996); United States v. Silvers, 932 F. Supp. 702 (D. Md. 1996); Stelor Prods., Inc., v. Google, Inc., No. 05-80387, 2008 U.S. Dist. LEXIS 74936, at *3 (S.D. Fla. Sept. 15, 2008) (order partially granting plaintiff's motion to compel and defendant's motion for protective order). Silvers said he wanted to use his Googles to teach children about social values. Stelor Prods., Inc., v. Google, Inc., No. 05-80387, 2008 U.S. Dist. LEXIS 74936, at *3 (S.D. Fla. Sept. 15, 2008) (order partially granting plaintiff's motion to compel and defendant's motion for protective order). In 1997 Silvers registered the domain name googles.com (coincidentally around the time Google, Inc. registered its IP address) claiming that he wanted to develop an interactive children's website to promote and sell books and other Googles merchandise. Id.

In 2002, Stelor acquired Silvers's rights to sell Googles products and use the Googles trademarks, intellectual property, and IP address. Stelor Prods., LLC, v.

(continued...)

OPINION

The Commissioner noticed that the Esrigs hadn't filed their tax returns for 1998, 1999, and 2000, and sent Steven notices of deficiency for those three years in August 2003. The notices asserted that Steven had more than $1.5 million in total unreported taxable income and that he was also liable for various penalties.

The Esrigs finally filed their 1998 and 1999 returns in late October 2003, and their 2000 tax return a week later. Steven quickly filed his petition for all three years. We set the case for trial in 2005, but the parties then agreed to continue the case to see if they could settle after the Commissioner looked at the late-filed returns.

What happened instead was that the Commissioner got more curious about the Esrigs, and expanded his investigation to later years and related companies. In early 2008, he sent both Esrigs notices of deficiency for 2001, 2002, and 2003. The Esrigs filed another petition for these years, which we consolidated with

---

[3](...continued)
Silvers, No. 05-80393 (S.D. Fla. July 17, 2006) (report and recommendations). It then used them to sue other companies (one of which was Google) for trademark infringement and the like. Stelor Prods., LLC v. Oogles N Googles Franchising, LLC, No. 05-0354 (S.D. Ind. Jan. 13, 2009) (order of dismissal with prejudice of all claims, counterclaims, and third party claims); Stelor Prods., Inc. v. Google, Inc., No. 05-80387, 2008 U.S. Dist. LEXIS 74936, at *2 (S.D. Fla. Sept. 15, 2008).

Steven's earlier one.  Settlement talks continued, but in the summer of 2009 the Esrigs' attorney moved to withdraw as counsel:  The couple had filed for divorce, and Steven wouldn't waive the resulting conflict of interest.

The case finally staggered to trial in Baltimore in 2010, with the Esrigs representing themselves.  They are, and were when they filed their petitions, Maryland residents.  After making several concessions, the Commissioner says these are the deficiencies, additions to tax, and penalties still at issue:[4]

---

[4] The Commissioner conceded enough deductions elsewhere in the notices of deficiency and in the prolonged pretrial proceedings that it's possible that the Esrigs did not underpay for some of the years at issue.  For any such years, of course, there may not be penalties.

|  | | Additions to Tax/Penalties | | |
|------|------------|------------------|-----------|-----------|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6654 | Sec. 6662 |
| 1998 | $124,983 | $31,243.00 | $5,672.01 | --- |
| 1999 | 261,455 | 65,260.25 | 12,534.00 | --- |
| 2000 | 203,841 | 50,965.50 | 10,962.43 | --- |
| 2001 | 22,407 | 4,617.25 | --- | $4,481 |
| 2002 | 40,387 | 10,066.75 | --- | 8,077 |
| 2003 | 52,918 | 19,834.25 | --- | 10,584 |

And these are the particular items being disputed:

! net operating loss (NOL) carryovers claimed for 1998-2003;

! SEC's business losses for 1998-2002;

! office expenses deducted for 2002 and 2003;

! section 179 deduction for 2003;

! unreported rental income for 2002 and 2003;

! capital gain and losses for 2001 and 2002;

! additions to tax under section 6651(a)(1) for 1998-2003;

! additions to tax under section 6654 for failing to make estimated tax payments in 1998-2000; and

! accuracy-related penalties under section 6662 for 2001-2003.

Everything else is computational.

I.      <u>Substantiation Issues</u>

We begin by noting that the Esrigs bear the burden of proving the Commissioner's deficiency determinations are incorrect.  <u>See</u> Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).  The Code also requires the Esrigs to maintain sufficient records to substantiate their claimed deductions.  <u>See</u> sec. 1.6001-1(a), Income Tax Regs.  The fact that the Esrigs reported deductions on their returns is not itself substantiation.  <u>See, e.g.</u>, <u>Wilkinson v. Commissioner</u>, 71 T.C. 633, 639 (1979).

A.    NOL Carryovers

| Year | Total NOL carryovers claimed | Amount allowed by IRS |
|---|---|---|
| 1998 | $39,384 (1994)<br>15,800 (1995)<br>45,989 (1996)<br>145,148 (1997)<br>246,321 | -0- |
| 1999 | 39,384 (1994)<br>15,800 (1995)<br>45,989 (1996)<br>145,148 (1997)<br>113,892 (1998)<br>360,213 | -0- |
| 2000 | 73,316 (1997)<br>113,892 (1998)<br>187,208 | -0- |
| 2001 | 11,295 (1997)<br>113,892 (1998)<br>125,187 | -0- |
| 2002 | 26,649 (1998)<br>26,649 | -0- |
| 2003 | 26,649 (1998)<br>13,777 (2002)<br>40,426 | -0- |

In general, a taxpayer has an NOL when he has more deductions than income in a given tax year.  See sec. 172(c) and (d).  Taxpayers with a big NOL in one year may be able to report zero income in that year and use the remaining loss to offset income in other years.  See sec. 172(a) and (b).  Section 172 says that an NOL has to be carried back to the 2 taxable years before the loss year and,

if the loss hasn't been fully absorbed, forward up to 20 years.[5] See sec. 172(b)(1).

The taxpayer, however, may elect to waive the carryback years. See sec.

172(b)(3).

The parties dispute the NOL carryovers the Esrigs reported on their 1998-

2003 returns and that we summarize in the table above. To substantiate their NOL

carryovers, the Esrigs had to establish that they incurred NOLs for 1994, 1995,

1996, 1997, 1998, and 2002, and that they were entitled to carry those losses

forward to the years at issue.[6] But the only documents they introduced to support

their NOLs are the returns they filed for 1998 through 2003, including certain IRS

worksheets used to help taxpayers with their NOL computations. Tax returns,

however, are not substantiation, see, e.g., Lawinger v. Commissioner, 103 T.C.

428, 438 (1994), so we sustain the Commissioner's determination and disallow the

Esrigs' NOLs.

---

[5] Before the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1082(a), 111 Stat. at 950, an NOL was first carried back 3 tax years and then carried forward for 15.

[6] We may determine the amount of a net operating loss for a year--even if an assessment of tax for that year is barred--to determine the correct NOL carryover for the tax year that is at issue. See sec. 6214(b); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 274 (1990).

B.    Schedule E Losses:  SEC Financial Services

| | SEC Financial Services | |
|---|---|---|
| Year | Per return | Per IRS |
| 1998 | ($79,399) | -0- |
| 1999 | (54,664) | -0- |
| 2000 | (42,842) | -0- |
| 2001 | (9,529) | -0- |
| 2002 | (22,014) | -0- |
| 2003 | 4,065 | -0- |

The Commissioner conceded the losses the Esrigs reported on their Schedule E for their "Real Estate Rental Business" and for "EGG, International" but continues to dispute the losses the Esrigs reported for SEC on their 1998-2002 returns.  The Commissioner argues that the Esrigs haven't shown that SEC was engaged in a trade or business, and that they haven't shown that SEC actually incurred the expenses that generated the losses claimed on their returns.

The Commissioner has a point:  The only evidence of SEC's business activities--other than the Esrigs' tax returns--that we could find in the record was a Maryland building contractor's license issued in 2003, and of course Steven's own testimony.  The documentary evidence isn't enough to prove the SEC losses,

and Steven's testimony didn't jibe with what was reported on the Esrigs' returns. We do not find it credible.

The Esrigs reported income, expenses, and losses from their real-estate rental properties separately, and the Commissioner generously left those items unadjusted. SEC, however, didn't report any gross receipts for 1998 through 2002.[7] We therefore aren't sure why the Esrigs claimed additional losses and expenses for SEC on their returns, and what they were for.

We also can't apply the rule of <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930), and estimate the proper deductions because we have no reasonable way to approximate SEC's deductible business expenses from the record. <u>See Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-43 (1985). We find for the Commissioner on this issue, and don't even need to address his argument that SEC was not a trade or business.

---

[7] In 2003 SEC reported $4,650 of net income, but we have no idea how it was earned and where it came from. The Commissioner has agreed that this income doesn't exist, and reduced the Esrig's 2003 tax liability by a corresponding amount.

C.     Office Expenses

| Year | Per Return | | Per IRS | | Office Expense at Issue | | |
|------|--------|--------|--------|--------|--------|--------|--------|
|      | Steven | Lori | Steven | Lori | Steven | Lori | Total |
| 2002 | $11,248 | $11,885 | $2,885 | $3,522 | $8,363 | $8,363 | $16,726 |
| 2003 | 70,361 | 1,928 | 47,890 | 1,928 | 22,471 | --- | 22,471 |

The Esrigs both worked out of their 13,000-square-foot home and deducted office expenses during all the years in dispute. The Commissioner, however, challenges many of their office-expense deductions only for 2002 and 2003. He says that the Esrigs haven't shown that they had office expenses in an amount greater than what he's already allowed them for 2002; he also argues that the Esrigs shouldn't have taken an office-expense deduction on their 2003 return for the costs of painting the exterior of their home and maintaining a fish tank. We agree: The Esrigs offered no credible evidence on these points.

D.     Section 179 Expense

Steven claimed a $17,700 deduction under section 179[8] on his 2003 tax return for the cost of a fish tank and dining room furniture. The Commissioner

---

[8] Sec. 179 allows a taxpayer in some circumstances to deduct the entire cost of a capital asset in the year it's first used in a business, rather than depreciating that cost over the asset's life.

disallowed these expenses because the Esrigs weren't able to demonstrate the business use of the property.

The only evidence they offered at trial to substantiate this deduction was Steven's testimony. He told us that both he and his wife used their dining room table primarily for business meetings, and that they put in a fish tank in the foyer of their home where their business contacts would sit and wait for meetings. We did not find Steven's testimony credible, and agree with the Commissioner on this issue as well.

E.    Unreported Rental Income

| Year | Claimed | Amount determined by IRS |
|------|---------|--------------------------|
| 2002 | 0 | $3,600 |
| 2003 | 0 | 68,400 |

Steven admitted at trial that the Esrigs received rent from Stelor for the business use of their home. And on the returns signed by Steven on behalf of Stelor, the company deducted rental expenses of $3,600 and $68,400 for 2002 and 2003. The Esrigs, however, didn't report this income on their personal returns for those two years. We therefore sustain the Commissioner's determinations as to the Esrigs' unreported rental income for 2002 and 2003.

F.    Capital Gains

| Year | Property sold | Gain/loss reported | Adjustment to income |
|------|---------------|--------------------|----------------------|
| 1999 | 3254 Q Street | $9,175 | --- |
| 2000 | 3538 S Street | 159,282 | --- |
| 2001 | 3407 R Street NW | 199,741 | $47,306 |
| 2002 | 2121 Marymount Drive | (130,599) | 130,599 |
| Total | | | 177,905 |

Someone who sells property is taxed on the gain, not the sale price.  See secs. 1001(a), 1011.  The seller gets "basis" for the amount he paid for the property, and his basis is then *adjusted* according to the rules in section 1016.  See secs. 1012, 1016.  The gain is basically the amount the seller receives reduced by the seller's adjusted basis in the property.  See sec. 1011.

The Commissioner argues that the Esrigs had more gain on the sale of their properties in 2001 and 2002 than what they reported because they overstated their bases in both the R Street and Marymount Drive properties.  The Esrigs presented no evidence on this issue, so we find for the Commissioner once again.

II.    Additions to Tax and Penalties

The final issues are the additions to tax that the Commissioner asserts under sections 6651(a)(1) and 6654, and the penalties under section 6662 for 2001-2003.

A.    Section 6651(a)(1):  1998-2003

Section 6651(a)(1) imposes an addition to tax for failing to timely file a tax return.  A taxpayer can beat the penalty by showing reasonable cause, id., which here would mean proof that the Esrigs acted with ordinary business care and prudence and nevertheless were still unable to file as required,  see  United States v. Boyle, 469 U.S. 241, 246 (1985); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

The Esrigs were often very late in filing:

| Year | Filing date | Tardiness of the return |
|------|-------------|-------------------------|
| 1998 | Oct. 30, 2003 | 4 yrs. 6 mos. 15 days |
| 1999 | Oct. 30, 2003 | 3 yrs. 6 mos. 13 days |
| 2000 | Nov. 5, 2003 | 2 yrs. 6 mos. 20 days |
| 2001 | June 11, 2004 | 2 yrs. 1 mo. 27 days |
| 2002 | Oct. 12, 2004 | 1 yr. 5 mos. 27 days |
| 2003 | Dec. 27, 2005 | 1 yr. 8 mos. 12 days |

At trial Steven blamed the couple's return preparer. He said that he'd asked his accountant to request extensions for all the years at issue, but his accountant missed all the deadlines because she had to serve a very long prison sentence for murdering her husband, and the person in her office who took over their account made a slew of mistakes.

We aren't convinced. The Esrigs had no evidence to corroborate this lurid tale, and we therefore find that they had no reasonable cause for failing to timely file. Accordingly, we find Steven liable for the failure-to-timely-file additions to tax for 1998-2000 and both Esrigs liable for the failure-to-timely-file additions for the later years.

## B.    Section 6654:  1998-2000

The Commissioner also asserts additions to tax against Steven under section 6654 for the failure to pay estimated taxes for 1998-2000. We are satisfied that the Commissioner has carried his burden in showing that Steven owed taxes and had paid insufficient estimated taxes for those three years. The only tax payments the Esrigs showed on any of the returns were a measly $11 in withholding for 1998 and $416 for 2000, plus an earned income tax credit for 1998. We therefore find

Steven liable for the section 6654 addition to tax for 1998, 1999, and 2000 if, of course, the Rule 155 computations show an underpayment for those years.

C.     Section 6662:  2001-2003

The final issue is whether the Esrigs are liable for the 20% accuracy-related penalty under section 6662(a) and (b)(1) and (2) for neglecting or disregarding the tax rules and regulations, or for substantially understating their income tax liability.

"Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, including any failure to keep adequate books and records or to substantiate items properly.  See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.  And a "substantial understatement" includes an understatement of income tax that exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  See sec. 6662(d)(1)(A); sec. 1.6662-4(b), Income Tax Regs.

The Commissioner certainly showed that the Esrigs kept generally inadequate books and records for 2001-2003.  Given that the Esrigs have not produced any credible evidence to establish why this penalty should not apply for 2001-2003, we sustain the Commissioner's determinations that they are liable for the accuracy-related penalty on the ground of negligence for the entire amount of

the underpayment for each of these years. We also specifically find that the Esrigs were negligent in deducting from their 2003 income the cost of dining room furniture and of feeding and housing their pet fish. We also specifically find them negligent in failing to report the rental income they got from Stelor.

Decisions will be entered

under Rule 155.