T.C. Memo. 2016-11

UNITED STATES TAX COURT

RODNEY C. NIEMANN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28054-12.                    Filed January 19, 2016.

Rodney C. Niemann, pro se.

<u>Michael W. Lloyd</u> and <u>Pamela J. Sewell</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Rodney Niemann is an engineer from Phoenix who

drafted property-condition reports and environmental site assessments for Wall

Street lenders--until the crash of 2008.  The recession hit Niemann's business

hard, and the demand for his services fell.  Niemann responded by starting a

[*2] successful second career in real estate. But this new career led him to claim a slew of deductions and engage in complicated transactions that brought him under the Commissioner's eye.

FINDINGS OF FACT

Niemann is a certified professional civil engineer and has long worked as a real-estate adviser. His advice is of a particular kind--he used his engineering knowledge to assess possible environmental problems for large commercial lenders before they would agree to finance real-estate projects. The demand for that kind of service depends on the demand for major commercial real-estate projects. And the number of such projects in Arizona sank after the recession began. Niemann scrambled to put his talents to use in some other way, and began what he called an "alternate day job" of buying distressed real estate to hold until he could turn it for a profit. He has been doing this, and doing it well, since 2008. But he's been doing it through a tangle of entities, including the three at issue here: Dependable Project Services, LLC; Real Estate Rabbit, LLC; and Magic, LLC.

Dependable Project

Niemann formed Dependable Project in 2003 to prepare property-condition reports, but then used it to hold his investments in mineral rights. For 2009 and

[*3] 2010--the tax years at issue here--Niemann claimed business-expense deductions for Dependable Project on his personal Schedules C. Among them was $8,000 that he paid to an attorney to evaluate the collection potential of a large portfolio of distressed student loans that he had been offered by Wall Street lenders.

The attorney advised him that the package of student loans was not viable: The offer price was about $2 million and their face value was only $3 million. The discount was too small, and Niemann decided that he wouldn't buy. The parties dispute the deductibility of this expense.

Real Estate Rabbit, LLC

Niemann formed Rabbit late in 2008 and named himself manager and his IRA as sole member. Rabbit also held mineral rights and personal notes, but he intended it mainly to hold distressed real estate. For a while he was "very active on the courthouse steps buying * * * [houses] at auction" and then flipping them for a profit. Niemann had an excellent eye for value and in 2009 (one of the years at issue) resold nine properties: all but one at a profit. When he filed his amended 2009 return he reported $126,000 in short-term capital gain. In computing this gain, however, he included in his basis several home-office expenses that he deemed related to the sale of those properties.

**[*4]**   Niemann had large amounts of other home-office expenses.  They only increased after his office was burglarized and his computers were stolen in July 2009, an event that prompted him to begin running Rabbit out of his home.[1]  This also made his taxes more complicated, since he rents his home from his girlfriend, and he divides the rent he pays her into separate portions:  One is for the use of the property as his residence, and the other is for the use of the property as his office.  Niemann credibly testified that he had throughout these years used a fenced-in area on the property exclusively to store his business equipment.  The burglary forced Niemann to set aside more space within his home for his business operations, and he converted an entire wing of the house into his principal place of business.  Even so, excess paperwork, along with Christmas decorations and other miscellaneous personal items, began to clutter the garage.

Though we don't doubt that Niemann had expenses in running Rabbit, he didn't report them in the usual way on a separate Schedule C for either 2009 or 2010, despite the fact that Rabbit held four of his investment properties.  Instead, as we've already mentioned, he claimed these expenses on his 2009 return as an

---

[1] Our Court sometimes encounters unbelievable explanations for missing records, but Niemann's records were on his computers and it was they that were stolen, according to his credible testimony--made more credible because it was backed up by a contemporaneous police report of the burglary.

[*5] increase to basis in the properties. He also lumped these properties with properties that he held in his own name on his Schedule D for the year he sold them.

Magic, LLC

Niemann's tax reporting became even more tangled after he began to look for ways to reduce the tax burden on what was looking like an increasingly profitable business. His reporting went most awry after he attended seminars advertising the use of a self-directed "checkbook LLC." He explained that what that meant to him was simply the process of writing checks inside of an LLC that is inside of a tax-advantaged IRA. This information was sold to anyone who attended these seminars.

Magic, LLC, was central to this tax planning. In 2009 he formed it, but "forming" it in his case meant that he hired a vendor to draft the appropriate documents. The vendor filled out a multimember form for the LLC, but it doesn't appear that the vendor ever made any representation that the form would actually *make* the company a multimember LLC. And we find that Niemann was Magic's only member and manager. In any event, Niemann didn't file a separate schedule or return for Magic. He did credibly testify that he intended a series of property

**[*6]** transfers during the years at issue between himself, his IRA, Magic, and Rabbit not to be "prohibited transactions" under section 4975.[2]

Simply filling out a form that claims an LLC has multiple members doesn't make it true. Niemann, who we found to be a very smart man though not trained in law, realized as trial neared that Magic was not actually a multimember LLC. This led him to then concede that he had engaged in numerous "prohibited transactions" with his IRA. For example, Niemann arranged for Rabbit--the entity that he had tucked into his IRA--to transfer one property to himself and another to Magic, which he wholly owned.

---

[2] Section 4975 limits the transactions that qualified retirement plans, including certain IRAs, can do. It defines as a "prohibited transaction" any direct or indirect: (1) sale or exchange, or leasing, of any property between a plan and a disqualified person; (2) lending of money or other extension of credit between a plan and a disqualified person; (3) furnishing of goods, services, or facilities between a plan and a disqualified person; (4) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan; (5) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of plan in his own interests or for his own account; or (6) receipt of any consideration for his personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan. A shorthand description is that the section bans self-dealing between a retirement plan and its beneficiary. Congress barred this sort of self-dealing to prevent taxpayers from using their retirement plans to engage in transactions that could put plan assets and income at risk before retirement. See sec. 4975; S. Rept. No. 93-383 (1973), 1974-3 C.B. (Supp.) 80; H.R. Rept. No. 93-807 (1974), 1974-3 C.B. (Supp.) 236. As usual, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*7]**    This meant that Niemann had terminated his IRA.  And this termination is with extreme prejudice--the IRA's assets are deemed distributed.  See secs. 72(t), 408(e)(2)(B).  And what "deemed distributed" means to Niemann is actually "added to his taxable income"--about $230,000 in extra income according to the notice of deficiency--for the 2009 tax year.

Niemann prepared his own 2009 return, but then hired a CPA to amend that return and file his 2010 return.  The Commissioner issued a notice of deficiency that disallowed numerous Schedule C expenses and Schedule E mortgage-interest deductions for the properties Niemann was buying and holding and also increased his income by the amount of the deemed distribution of his IRA.  The Commissioner also asserted accuracy-related penalties for both years.

Niemann, an Arizona resident, timely filed a petition with this Court contesting the entire contents of that notice.  The parties settled almost all the issues, including the prohibited-transaction issue.  This leaves only the following items in dispute:

| [*8]     Item | 2009 | 2010 |
|---|---|---|
| Travel expenses | $8,193 | $16,097 |
| Legal and professional services | n/a | 8,000 |
| Short-term capital gain | 29,413.49 | n/a |
| Section 6662(a) penalties | 22,333.40 | 3,338.40 |

OPINION

A.    Deductibility of Travel, Meals and Entertainment

Niemann claims deductions of about $8,000 for 2009 and $16,000 for 2010 for travel to and from properties in several states. Section 274 subjects all travel expenses to very detailed substantiation requirements. While a contemporaneous log isn't necessary, a taxpayer like Niemann must still substantiate by adequate records or other corroborating evidence the amount, time, place, and *business purpose* of the expense. Sec. 1.274-5T(c)(1) and (2), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985) (emphasis added). For both years at issue here Niemann offers only reconstructed logs that he prepared after receiving the notice of deficiency. He constructed his 2009 log from credit-card receipts, bank receipts, and copies of cashier's checks. His 2010 log was a "cut

**[\*9]** out of a Quicken bookkeeping program," but at least it was based on billings and work orders--though he submitted none of these to the Commissioner.

Reconstructed logs often fail to properly detail the business purpose of each expense. See Hentges v. Commissioner, T.C. Memo. 1998-244, 1998 WL 355504, at \*3. And Niemann doesn't offer any other corroborating evidence aside from his own, albeit credible, testimony that his "business required travel." Section 274 simply requires more specificity.[3] See, e.g., Boyd v. Commissioner, 122 T.C. 305, 321 (2004); see also, e.g., Irwin v. Commissioner, T.C. Memo. 1996-490, 1996 WL 626334, at \*7, aff'd without published opinion, 131 F.3d 146 (9th Cir. 1997). We find for the Commissioner on this issue.[4]

---

[3] During trial Niemann said that he did indeed have things like receipts, invoices, and other evidence of individual expenses, but, as he did not turn those over to the Commissioner or us, they do him no good.

[4] Some of Niemann's 2009 computer records were stolen, and that normally would mean that he could avail himself of less stringent recordkeeping requirements under section 1.274-5T(c)(4) and (5), Temporary Income Tax Regs., 50 Fed. Reg. 46022 (Nov. 6, 1985). But Niemann provided no evidence that his recordkeeping was more complete or accurate before the theft. See, e.g., Hentges v. Commissioner, T.C. Memo. 1998-244, 1998 WL 355504, at \*4. Indeed, Niemann prepared his logs only in response to the notice of deficiency, and it's important to note that *only* his computer records were stolen--not the paper documentation he neglected to turn over to the Commissioner.

**[\*10]** B.    <u>Deductibility of Legal and Professional Fees</u>

On his 2010 Schedule C Niemann deducted the $8,000 in attorney's fees that he'd paid through Dependable Project for investigating the package of student loans that he'd been offered.[5]  A taxpayer can generally deduct any ordinary and necessary expenses paid or incurred while carrying out a trade or business.  Sec. 162(a).  But did the few personal notes Niemann held in the past amount to a trade or business?

Though the Code doesn't define either "trade" or "business", caselaw has established that to be engaged in a trade or business, a taxpayer must be involved in the activity with continuity and regularity, and the primary purpose of that activity must be income or profit.  <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 35 (1987).

We don't doubt that Niemann was holding the distressed notes to make a profit.  But a taxpayer is "continually" and "regularly" involved in a business activity only if he can show extensive business activity over a substantial period. <u>Jafarpour v. Commissioner</u>, T.C. Memo. 2012-165 (citing <u>Stanton v. Commissioner</u>, 399 F.2d 326, 329-330 (5th Cir. 1968), <u>aff'g</u> T.C. Memo. 1967-

---

[5] We note that Niemann did not argue that these fees were deductible as an expense of producing income under section 212.

[*11] 137).  Sporadic activities don't qualify.  <u>Groetzinger</u>, 480 U.S. at 35;

<u>Jackson v. Commissioner</u>, 86 T.C. 492, 514 (1986), <u>aff'd</u>, 864 F.2d 1521 (10th

Cir. 1989).

It's clear from the record before us that Niemann's business was centered on

buying and selling real estate.  We do find that he also made "several" loans to

realtors, though it's unclear from the record just how many notes documenting

such loans he ever held.  During trial he described only two, and there is nothing

in the record that shows he ever held more than these two.  It's also clear from

Niemann's testimony that during 2010--the tax year at issue for this deduction--

Dependable Project didn't hold any notes, nor did it redeem or issue any new

notes.

More activity than this would still not be enough especially where the

taxpayer--like Niemann--didn't engage in the supposed business activity during

the years at issue.  For example, in <u>Douglas v. Commissioner</u>, T.C. Memo. 1998-

165, <u>aff'd</u>, 181 F.3d 87 (4th Cir. 1999), we held that even though a taxpayer

bought eleven properties, renovated seven, and sold two of them in the past, his

failure to sell any *during the years at issue* meant that he wasn't engaged in real-

property development on a regular and continuous basis.  <u>See also</u> <u>Ohana v.

Commissioner</u>, T.C. Memo. 2014-83, at *12 (taxpayer not in business of buying

**[*12]** and selling real estate where he didn't buy or sell any real estate during tax years at issue). We therefore find Dependable Project's moneylending to realtors insufficiently "continuous" and "regular" to amount to a business investing in debt or distressed debt.

Moreover, even if Niemann intended to get into the business of making and holding loans in the future, his activity was at most sporadic in 2010, and a business must have already begun for us to allow a deduction under section 162. See McManus v. Commissioner, T.C. Memo. 1987-457, aff'd without published opinion, 865 F.2d 255 (4th Cir. 1988); see also Wolfgram v. Commissioner, T.C. Memo. 2010-69 (intent to operate property as a bed and breakfast before operation began not regular or continuous activity).

We decide in favor of the Commissioner on this issue.

C.    Schedule D: Short-Term Capital Gain

This confusing issue started with Niemann's 2009 Schedule D. Niemann reported $126,000 in short-term capital gain from the sale of several properties that year. He included in his basis home-office expenses of $29,000. On his 2009 Schedule C Niemann entered several similar expenses, but didn't report them specifically as home-office expenses. The Commissioner added to the confusion by increasing Niemann's 2009 short-term capital gain by $62,000 in the notice of

**[\*13]** deficiency, and he asserted in his pretrial memorandum that this adjustment was due in part to $29,000 in home-office deductions that Niemann improperly claimed on his Schedule D.[6]

Niemann's short-term capital gain was, again, from the sale of several "flipped" homes. He calculated his bases in the homes by including not only the purchase price of each home but also by including various costs "attributed to" them. The reason he attributes these particular costs to the sale of property is that--as he explained during trial--they are representative of various expenses related to Rabbit and Magic. This includes "real estate signs for the properties for sale, leasing agreements * * * the mileage to and from the job sites." The $29,000 at issue look more like Schedule C expenses for Rabbit and Magic whereas the deductions Niemann actually took on his Schedule C are for expenses of Dependable Project's business activities.

We agree with the Commissioner that Niemann's home-office expenses aren't a cost of acquiring the properties and Niemann shouldn't have included them in his bases. The basis of a piece of property is what the property cost. Sec.

---

[6] We never did figure out where the $62,000 came from. During trial the Commissioner conceded that "the only issue that remains as to the $62,000 is whether or not the $29,000 * * * should be allowed or not." We treat this as a concession of the remaining $33,000 of the asserted increase in capital gain.

**[\*14]** 1012(a). Taxpayers can adjust their basis in property for expenditures, receipts, losses, or other items properly chargeable to a capital account. Sec. 1016(a)(1). The cost of the improvements (not at issue here) that Niemann made to the properties before he sold them is properly included in his bases because they are part of the cost of the property. See sec. 1.1016-2(a), Income Tax Regs.[7] The cost of his home office is just a cost of doing business. See sec. 280A. He should have reported these expenses on his Schedule C.

The Commissioner takes his argument one step further. He argues that even if Niemann moves the $29,000 to his Schedule C, he still can't take a deduction for them because he hasn't *substantiated* them. The Commissioner raised this issue for the first time during trial, so before we can decide the issue on its merits, we must decide whether it's properly before us.

We've often held that we won't consider issues that haven't been properly raised in the pleadings or by an amendment to the pleadings. Foil v. Commissioner, 92 T.C. 376, 418 (1989), aff'd, 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975). There is of course an exception to the rule. Rule 41(b)(1) treats an issue as if it had been raised in the

---

[7] We also agree that those properties aren't personally owned by Niemann, but by Rabbit, and should have been reported on a separate Schedule C. The parties' Rule 155 computations should reflect this.

**[\*15]** pleadings if it was tried with the express or implied consent of the parties.

See, e.g., LeFever v. Commissioner, 103 T.C. 525, 538 n.16 (1994), aff'd, 100

F.3d 778 (10th Cir. 1996).  In deciding whether a party gave implied consent, this

Court considers whether that consent would result in unfair prejudice.  Bulas v.

Commissioner, T.C. Memo. 2011-201, 2011 WL 3625098, at \*1 n.2; see also WB

Acquisition, Inc. & Subs. v. Commissioner, T.C. Memo. 2011-36, aff'd sub nom.

DJB Holding Corp. v. Commissioner, 803 F.3d 1014 (9th Cir. 2015); McGee v.

Commissioner, T.C. Memo. 2000-308.

The potential for unfair prejudice here is plain.  The Commissioner

maintained in his pretrial memorandum--just one week before trial--that the reason

we couldn't just move the home-office deductions to the Schedule C was that they

were "double-claimed."  It was only when this proved not to be true, that the

Commissioner raised the question of whether Niemann could substantiate these

expenses at all.  Niemann asserted--and we believe him--that the IRS hadn't

previously asked him for substantiation.  We therefore find this unfairly prejudiced

Niemann because it prevented him from presenting documents which he credibly

testified he had somewhere in his records.[8]  See Bulas, 2011 WL 3625098, at \*1

---

[8] The Commissioner did assert that the issue was raised generally in the notice of deficiency when he challenged Niemann's Schedule C, but that isn't the

(continued...)

**[*16]** n.2 (finding prejudice where the Commissioner raised a new issue during

trial thereby preventing the taxpayer from being able to conduct an investigation

of his records); see also Estate of Huntsman v. Commissioner, 66 T.C. 861, 872

(1976) (finding no timely notice where a taxpayer was deprived of any opportunity

to present the relevant evidence).[9]

_____

[8](...continued)
case. The Commissioner challenged only three items (out of 12 claimed deductions) on Niemann's Schedule C. The pleadings contain no mention of substantiation in regard to Niemann's home-office expenses. The Commissioner's pretrial memorandum also indicates that he will *not* be challenging whether Niemann had home-office deductions as he assumes they were double counted. See Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 733-34 (1981) (dismissing Commissioner's claim that statutory notice was broad enough to include a new issue).

[9] Even if we were to find trial by consent, we would still find for Niemann on the alternative ground that the Commissioner failed to meet his burden of proof. The Commissioner had this burden because lack of substantiation is a new theory--an attempt by the Commissioner "to rely on a basis that is beyond the scope of the original determination." Evans v. Commissioner, T.C. Memo. 2010-62 (quoting Shea v. Commissioner, 112 T.C. 183, 191 (1999)). When a new theory increases the deficiency or requires the taxpayer to introduce new or different evidence it becomes a "new matter." Id. The Commissioner's lack-of-substantiation theory forced Niemann into relying on records that he didn't have with him at trial because he had no notice he'd need them. This means that it was a new "matter" and the burden of proof was on the Commissioner. See Shea, 112 T.C. at 191. Because the Commissioner presented no evidence and offered no testimony at trial on this new matter, we would still find for Niemann on this issue.

**[\*17]** D.    Penalties

The Commissioner asserts accuracy-related penalties for each of the years at issue.  Under section 6662(b)(1) and (2), accuracy-related penalties are appropriate where an underpayment of tax is attributable to a taxpayer's "negligence or disregard of rules or regulations" or "any substantial understatement of income tax."  Whether the Commissioner met his burden of production in this case is a simple math problem.  An understatement of tax is "substantial" if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." Sec. 6662(d)(1)(A).  For both the 2009 and 2010 tax years Niemann's understatement greatly exceeded both $5,000 and 10% of the tax required to be shown on his return.  The Commissioner has met his burden with respect to the substantial understatement.

Niemann may rebut the penalty by showing evidence that his mistakes were reasonable and in good faith.  See sec. 6664(c)(1).  In deciding whether he has proven this defense, we examine all the relevant facts and circumstances, including his efforts to determine his proper tax liability and whether he relied in good faith on professional advice.  See sec. 1.6664-4(a), Income Tax Regs.  We discuss the relevant tax years and issues separately.

[*18] 2009

Niemann prepared his own 2009 return.  Niemann didn't submit evidence or provide testimony to show reasonable cause for his failure to keep adequate records to substantiate his travel expenses for that year.  See sec. 1.6662-3(b)(1), Income Tax Regs.; Flake v. Commissioner, T.C. Memo. 2014-76; Diallo v. Commissioner, T.C. Memo. 2011-300; Garrison v. Commissioner, T.C. Memo. 2009-32.

Niemann also didn't show reasonable cause for believing that his home-office deductions should be taken as part of the bases in his real-estate investments.  He was a credible witness; but while we have granted relief from accuracy-related penalties because of an honest mistake of law, that relief is limited to situations where the law is unclear.  Van Wyk v. Commissioner, 113 T.C. 440, 449 (1999).  Here, Niemann even conceded during trial that the expenses he included in his bases for capital gain were representative of Schedule C expenses for Rabbit and Magic--had he filled out separate Schedules C for them.  Thus, we sustain the accuracy-related penalties for the 2009 tax year.[10]

_____

[10] With the exception of the accuracy-related penalty for early withdrawal from his IRA in 2009, the parties haven't resolved the penalties concerning the settled 2009 and 2010 issues.  Because Niemann didn't produce any evidence, or give any testimony regarding those issues during trial to establish why penalties

(continued...)

**[\*19]** <u>2010</u>

Niemann's tax return for the 2010 tax year was prepared and signed by a professional tax-return preparer.  Reliance on a preparer excuses a taxpayer from an accuracy-related penalty only if his reliance was reasonable.  <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).  Niemann's reliance on his CPA was reasonable if:

• the adviser was a competent professional with sufficient expertise to justify reliance;

• he provided necessary and accurate information to the adviser; and

• he actually relied on the adviser's judgment in good faith.  <u>Id.</u>

<u>Competent Professional</u>

Niemann's adviser was most certainly competent--he was a professional CPA at a reputable firm.  Niemann credibly testified at trial that the firm was a "CPA legal thing" and that it came highly recommended.  <u>See</u> <u>Zarlengo v. Commissioner</u>, T.C. Memo. 2014-161, at \*56 (finding that a CPA with 20 years' experience had "sufficient expertise to justify reliance").

---

[10](...continued)
shouldn't apply, we sustain the Commissioner's determination that he is liable for the accuracy-related penalty as to the other settled issues from the 2009 tax year. <u>See</u> <u>Esrig v. Commissioner</u>, T.C. Memo. 2012-38.

[*20]     <u>Provision of Necessary and Accurate Information</u>

Niemann must establish that he provided necessary and accurate information with respect to the items reported on his returns. Section 1.6664-4(c)(1)(i), Income Tax Regs., also requires that he disclosed all pertinent facts and circumstances that he knew or reasonably should have know to be relevant to the treatment of an item. See <u>Diaz v. Commissioner</u>, T.C. Memo. 2012-280. Niemann proved this with his credible testimony that he gave his CPA any documentation that he asked for, including but not limited to the Quicken printouts for the year at issue. Niemann's CPA also had all of the necessary information to report and did report Niemann's IRA transactions.

<u>Actual Reliance in Good Faith</u>

Niemann's reliance on his adviser was in good faith. The mistakes on the 2010 return involved complicated tax issues spanning three separate businesses, and issues of fact (e.g., the adequacy of the records that he showed his adviser, if not us, under section 274). Niemann's reliance on his accountant to prepare his 2010 return suffices for us to find in his favor on the section 6662 penalty for his 2010 tax year.

**[\*21]**  This means that

Decision will be entered under

Rule 155.