In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1186 and 00-1187

FRANK MUHICH, VIRGINIA MUHICH,
and MIDWEST PORTRAITS CORPORATION,

Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

Appeals from a Decision of the
United States Tax Court.
Nos. 21561-97 and 21562-97--David Laro, Judge.

Argued October 25, 2000--Decided January 25, 2001


   Before COFFEY, DIANE P. WOOD, and WILLIAMS, Circuit
Judges.

   COFFEY, Circuit Judge.  On August 6, 1997, the
Commissioner of Internal Revenue issued a notice
of deficiency to Frank and Virginia Muhich
stating that they had understated their tax
liabilities on their joint returns for the 1994
and 1995 tax years. On the same day, the
Commissioner also issued a notice of deficiency
to Midwest Portraits Corporation (Midwest) for
the tax years ending on June 30, 1994, 1995, and
1996./1 On October 13, 1999, the Tax Court
entered judgment in favor of the Commissioner in
the following amounts. With regard to the
Muhichs' joint return, the Tax Court assessed a
deficiency of $17,898 for the tax year 1994 and
$21,885 for the tax year 1995. The Muhichs also
received tax penalties pursuant to I.R.C. sec.
6662(a) for the tax years 1994 and 1995 of $3,580
and $4,377, respectively./2 With regard to
Midwest, the Tax Court assessed deficiencies for
the tax years ending on June 6, 1994, 1995, and
1996 of $1,800, $0, and $825, respectively.
Midwest also received penalties pursuant to
I.R.C. sec. 6662(a) of $360, $0, and $165 for the
tax years 1994, 1995, and 1996, respectively. We
affirm.

I.  BACKGROUND

   Frank Muhich is the owner, president, and
operator of a photography business located in

Mahomet, Illinois, doing business as Midwest Portraits Corporation. From 1985 forward, Midwest worked exclusively with fire, rescue, and ambulance departments in Illinois, Iowa, Wisconsin, and Indiana taking pictures, assisting in soliciting donations, and handing out complimentary certificates./3 Before the tax years contested by the IRS, Frank Muhich received a salary from Midwest which essentially amounted to him paying himself on a commission basis; the better Midwest performed, the higher Muhich set his salary.

All this changed in 1994 when Frank Muhich met with a financial planner named James Myers. Myers was a representative of Heritage Assurance Group, an entity that promoted multitrust schemes as a means of avoiding taxes. According to the district court, the Heritage tax avoidance scheme worked as follows:

An individual transfers his or her assets and right to receive income to a newly created family trust in exchange for a certificate of beneficial interest (CBI). A CBI gives the individual the right to receive any distributions that the trustee, who is the same as the transferring individual, decides to make. The family trust pays and deducts all of the trustee's personal expenses and distributes any excess corpus to a charitable trust created under the scheme. The individual creates other trusts to circulate funds among and between.

(Emphasis added).

After meeting with Myers, the Muhichs traveled to the home office of Heritage and met with Edward Bartoli, an attorney who was the principal promoter of Heritage's scheme. Bartoli, in turn, introduced the petitioners-appellants to James Savino, a certified public accountant associated with Heritage./4

On May 4, 1994, after paying Heritage $12,000 for a comprehensive trust packet, the Muhichs created the Muhich Asset Management Trust (Asset Trust)./5 Within days of the creation of the Asset Trust, Mrs. Muhich transferred virtually all of her property to her husband./6 In turn, Frank Muhich transferred all of his property (which now included his wife's property) to the Asset Trust, including the right to receive compensation for his services (i.e. the salary he received from Midwest). In exchange for this transfer, Frank Muhich and his wife received a CBI representing 50 and 40 units, respectively. At this time, the Muhichs were the sole trustees and sole beneficiaries of the Asset Trust.

What can only be described as a red light to the IRS, the Muhichs set up the following additional trusts. On May 7, 1994, the Asset Trust established the Muhich Charitable Trust (Charitable Trust). The Asset Trust received a CBI representing 100 units of ownership in the Charitable Trust and the Muhichs were listed as the sole trustees.

On May 15, 1994, the Asset Trust created the Muhich Business Trust (Business Trust). Once again, the Asset Trust received a CBI representing 100 units of ownership and the Muhichs were designated as the sole trustees. On May 18, 1994, the Business Trust created the Muhich Equity Trust (Equity Trust) and the Muhich Vehicle Trust (Vehicle Trust). The Business Trust funded the corpus of each trust with $10 in exchange for a CBI from each trust representing 100 units of ownership in each trust. As always, the Muhichs were again designated as the sole trustees.

As sole trustees and exclusive beneficiaries of the five trusts, the Muhichs had exclusive control over the trust property. Additionally, they, at their sole discretion, had the right to direct any and all distributions from the trusts. The couple also controlled the bank accounts, and their ability to deal with and benefit from all trust property was as free and unrestricted as before the trusts were established.

For example, Midwest conducted business the same as it did before the trusts were created. Frank Muhich continued to run the business and perform the same duties. However, he no longer took a formal salary from Midwest. Instead, Midwest contracted with the Asset Trust in order that the Asset Trust receive $3,000 per month plus possible additional compensation depending upon the company's performance.

1. The Trusts

The Asset Trust did not engage in any business or trade at any time. However, for the taxable years 1994 and 1995, the Asset Trust had approximately $114,370 and $202,242 in available funds deposited into its accounts. These funds included $100,820 and $130,193 for 1994 and 1995, respectively, in "consulting fees" received by the Asset Trust for services performed by Frank Muhich. The balance of these funds was composed of transfers from Midwest and other trusts characterized by the Muhichs as loans. From these funds, the Asset Trust paid the Muhichs' housing, transportation, healthcare, education, as well as miscellaneous expenses. These payments included: $70,000 in construction costs, interest costs,

and closing costs for their new home; all the education costs for their college-educated children; utility bills; automobile payments; mortgage payments; and trustee fees to the Muhichs. After deducting the expenses described above along with the donations made to the Charitable Trust (which the Muhichs controlled), the Asset Trust reported zero taxable income for the taxable years 1994 and 1995./7

It is interesting to note that the tax returns for the trusts in 1994 were prepared by Savino. The Muhichs' long-time tax advisors, the Martins, were not made aware of the petitioners-appellants' trust scheme until late 1994 when they prepared Midwest's tax return for the fiscal year. At that time, the Martins discovered that Frank Muhich had reportedly received no income from Midwest. The Martins became suspicious and questioned the petitioners-appellants as to the accuracy of their discovery. At the request of the Muhichs, one of the Martins attended a Heritage seminar. Although the Martins were concerned over the legality of the trust scheme (they advised Mr. Muhich of their concerns), the Martins prepared the Trusts' 1995 returns and the Charitable Trust's 1996 return. However, the Martins refused to prepare any other trust tax returns for the Muhichs.

2. Midwest

Midwest filed federal income tax returns for its fiscal years ending on June 30, 1994, 1995, and 1996. In each of these returns, several irregularities caught the attention of the IRS. For example, in its 1994 return, Midwest deducted the $12,000 fee it paid to Heritage for the comprehensive trust packet. Similarly, in the 1996 fiscal year, Midwest deducted $5,500 in fees relating to the administration of the trusts. Midwest labeled these payments "consulting fees" and deducted these amounts on its income tax returns. In the notice of deficiency, the Commissioner determined that the payments were not "ordinary and necessary" business expenses and that they were, in fact, non-deductible constructive dividends. The Commissioner disallowed the deductions in full.

3. The Muhichs

The Muhichs filed federal income tax returns for 1994 and 1995. On these returns, the Muhichs did not report any income from Midwest in the form of compensation or dividends. In the notice of deficiency, the Commissioner determined that the trust scheme was an abusive trust arrangement and therefore irrelevant for tax purposes. The

Commissioner further determined that Frank Muhich received constructive dividends/8 from Midwest in the amounts of $112,820 and $130,193 for 1994 and 1995, respectively.

## II.  ISSUES

On appeal, the Muhichs challenge the Tax Court's determination that the trusts were "shams" and should be disregarded for tax purposes. The Muhichs further challenge the Tax Court's decision to impose penalties under I.R.C. sec. 6662(a) as well as the decision to deny $17,500 worth of deductions.

## III.  ANALYSIS

The case before us resembled a "typical" family trust case, in which the taxpayer "assigns" his income and other assets to the trust and the trust funds are used to cover all his personal expenditures, purportedly allowing deduction of those expenditures. However, as we stated in Schultz v. Commissioner, 686 F.2d 490, 492-93 (7th Cir. 1982) (footnote in original),

It is fundamental to our income tax regime that personal consumption expenditures--food, clothing, travel, education, entertainment--do not generate income tax deductions unless they are somehow inextricably linked to the production of income./9 When taxpayers buy cars, travel, or take out life insurance policies, they make those expenditures out of after-tax dollars. The trust devices here are a transparent attempt to alter that state of affairs by turning all the families' activities into trust activities and all the families' expenses into expenses of trust administration. If this device worked, the Schulzes and the Whites would, unlike the rest of us, make all their consumptive expenditures with pre-tax dollars.

It is well-established that the Commissioner is not required to recognize, for tax purposes, those transactions which lack economic substance. See, e.g., Gregory v. Helvering, 293 U.S. 465, 467 (1935). As the Supreme Court has observed:

Decision of the issue presented in these cases must be based ultimately on the application of the factfinding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirms us in our conclusion that

primary weight in this area must be given to the conclusions of the trier of fact.

Commissioner v. Duberstein, 363 U.S. 278, 289 (1960). Furthermore, the question of economic substance is factual and the Tax Court's findings will not to be disturbed unless they are clearly erroneous. 26 U.S.C. sec. 7482(a)(1) (court of appeals reviews Tax Court decisions in same manner as district court decisions).

In Neely v. United States, 775 F.2d 1092, 1094 (9th Cir. 1985), the court stated,

The [Muhichs'] transfer of the title of assets to a trust while retaining their use and enjoyment is a sham transaction that will not be recognized for tax purposes. A sham transaction is one having no economic effect other than to create income tax losses. Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984), citing Thompson v. Commissioner, 631 F.2d 642, 646 (9th Cir. 1980). Even where a taxpayer has structured a transaction so that it satisfies the formal requirements of the Internal Revenue Code, legal effect will be denied it if its sole purpose is to evade taxation. Id. A trust arrangement may not be used to turn a family's personal activities into trust activities, with the family expenses becoming expenses of trust administration. Schulz v. Commissioner, 686 F.2d 490, 493 (7th Cir. 1982).

This is the situation we have before us. The Muhichs transferred their assets to the trusts and attempted to have the trusts pay all their personal expenses. As detailed above, courts have uniformly held that such transactions are a sham and that the Commissioner may disregard these sham trusts for tax purposes. This is what the Commissioner did and we can see no reason to overturn the determination of the Tax Court./10

The decision of the Tax Court is

AFFIRMED.

FOOTNOTES

/1 Frank Muhich is the president and sole shareholder of Midwest Portraits Corporation.

/2 I.R.C. sec. 6662(a) states:

Imposition of penalty--If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section

applies.

/3 Although the record is less than clear, it appears that Midwest is in the business of taking pictures of departmental employees and assisting in the production of promotional items.

/4 At about this time, the Muhichs submitted a form containing their financial information and assets to Heritage. On this form, the Muhichs stated that their number one objective was "tax avoidance."

/5 It is interesting to note that although the petitioners had used Kim and Denise Martin (certified public accountants) as tax advisors since 1982, they did not consult the Martins as to the legality of the trust scheme in question before creating the Asset Trust.

/6 This property included an exhaustive list of housewares, jewelry, electronics, and china.

/7 The other trusts also filed returns showing zero taxable income. Essentially, the other trusts served as conduits through which the Muhichs transferred money back to Midwest and themselves.

/8 Constructive dividends, or dividends in law, occur when a corporation confers an economic benefit upon a shareholder, in his capacity as such, without an expectation of reimbursement. That economic benefit becomes a constructive dividend, taxable to the respective shareholder.

/9 "Personal consumption expenses must obviously be treated as nondeductible on the whole; if they were allowed, the individual tax base could be reduced to zero through expenditures on personal living items and the notion of a tax on economic gain would have to be abandoned." M. Chirelstein, Federal Income Taxation P 7.01 at 140 (2d ed. 1979). Apart from some special provisions, id., not at issue here, deductions must be for ordinary and necessary business expenses (Section 162) and costs associated with investment activities (Section 212).

/10 The Muhichs' two remaining contentions on appeal, that the Tax Court's decision to impose penalties under I.R.C. sec. 6662(a) as well as the decision to deny certain deductions were erroneous, are comprised, in total, of approximately one page of double-spaced text. Instead of any detailed argument, the petitioners claim that "substantial authority exists" to support their claim and that "a review of the entire record" would establish the merit of their arguments. As we have repeatedly stated, "[i]t is not this court's responsibility to research and construct the

parties' arguments." United States v. Lanzotti, 205 F.3d 951, 957 (7th Cir. 2000). Where, as here, a party fails to develop the factual basis of a claim on appeal and, instead, merely draws and relies upon bare conclusions, the argument is deemed waived. Bonds v. Coca-Cola Company, 806 F.2d 1324, 1328 (7th Cir. 1986) (citing Morgan v. South Bend Community School Corp., 797 F.2d 471, 480 (7th Cir. 1986)); see, e.g., Gagan v. American Cablevision, Inc., 77 F.3d 951, 965 (7th Cir. 1996) (failure to cite any factual or legal basis for an argument waives it); Bratton v. Roadway Package Sys., Inc., 77 F.3d 168, 173 n. 1 (7th Cir. 1996) (argument that is not developed in any meaningful way is waived); Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Bd., 957 F.2d 302, 305 (7th Cir. 1992) (there is "no obligation to consider an issue that is merely raised [on appeal], but not developed, in a party's brief"); United States v. Haddon, 927 F.2d 942, 956 (7th Cir. 1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim [for appellate review]."); United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments . . . are waived . . . ."). Additionally, these claims are plainly without merit. Consequently, these arguments are waived and we do not consider them any further.