T.C. Memo. 2018-76

UNITED STATES TAX COURT

DONALD R. GOLAN AND SHEILA E. GOLAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13999-14.                    Filed June 5, 2018.

Walter D. Channels, for petitioners.

Jeri L. Acromite, Matthew A. Houtsma, and Miles Friedman, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge: With respect to petitioners' 2011 Federal income tax,
respondent determined a deficiency of $150,694 and an accuracy-related penalty
of $30,138.80 under section 6662(a).[1]

_____

[1] All section references are to the Internal Revenue Code (Code) in effect

(continued...)

[*2]   After concessions,[2] the issues for decision are whether petitioners:

(1) established a basis in solar panels and related equipment for purposes of

claiming an energy credit under sections 46 and 48 and a special allowance for

depreciation under section 168(k); (2) satisfied the requirements of section

168(k)(5); (3) had sufficient amounts at risk under section 465; (4) materially

participated in their solar energy venture under section 469; and (5) are liable for

the accuracy-related penalty under section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate

the parties' first stipulation of facts, second stipulation of facts, and accompanying

exhibits by this reference.  Petitioners resided in California when they timely filed

their petition.

Petitioner Donald R. Golan is a precious metals account representative for

Monex Deposit Co., and petitioner Sheila E. Golan is a fashion consultant.  In

2010 Mr. Golan sought an investment that would provide him with extra income.

---

[1](...continued)
for the tax year in issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

[2]  In their petition, petitioners dispute respondent's determination that they
had "other income" of $100,000.  At trial respondent conceded this issue.

[*3] In furtherance of this goal, a tax attorney acquaintance introduced him to Ken Salveson.

Mr. Salveson is a licensed contractor and attorney with a history of constructing and selling subsidized low-income housing. Sensing a business opportunity in the solar energy sector, Mr. Salveson formed Solar Energy Equities LLC (LLC or Mr. Salveson's LLC). Through the LLC, Mr. Salveson identifies property owners and offers them discounted electricity in exchange for permission to install solar panels and related equipment (solar equipment) on their properties (host properties). The LLC remains the owner of the solar equipment and temporarily retains the burdens and benefits of ownership (including all resulting tax credits and rebates). Then the LLC sells the solar equipment (and all rights and obligations therewith) to a buyer. One such buyer was Mr. Golan, who purchased solar equipment on three host properties.

Host Property 1

Tim Mann owns a warehouse in Indio, California (warehouse or host property 1). With Mr. Salveson's assistance, Mr. Mann filed an application with the local utility company for an Interconnection Agreement for Net Energy Metering from Residential and Commercial Solar or Wind Electric Generating Facilities of One Megawatt or Less (interconnection agreement) on March 1,

[*4] 2010. On June 29, 2010, Mr. Mann received a permit from the City of Indio to install a "solar system" on the warehouse.

Mr. Salveson's LLC and Mr. Mann entered into a power purchase agreement (PPA) dated July 1, 2010. Under the PPA Mr. Mann agreed to purchase discounted electricity from the LLC, which would generate the electricity by installing solar equipment on the warehouse. The LLC retained ownership of the solar equipment and was responsible for any servicing and/or repairs. Although the PPA had a five-year term, it was contingent on the LLC's receiving "certain financial incentives from the local public utility district and/or the United States Treasury Department." The PPA prohibited Mr. Mann from assigning the PPA to another party without the LLC's consent. Conversely, the LLC could assign its interest in the PPA to another party with 30 days' notice to Mr. Mann.

Mr. Salveson installed the solar equipment on the warehouse in July 2010. In November 2010 the City of Indio inspected the solar equipment. On December 30, 2010, a representative from the utility company signed the interconnection agreement. Under this agreement the utility company agreed to connect the solar equipment on the warehouse to the electric grid. Mr. Mann was required, as a precondition to connecting the solar equipment to the electric grid, to install "[a]

**[\*5]** dual meter socket with separate meters to monitor the flow of electricity in each direction" (bidirectional meter).[3]

On a date not established by the record, the utility company informed Mr. Mann that he was eligible for a rebate of $19,641.38.  Mr. Mann assigned the rebate to Mr. Salveson's LLC.

Host Property 2

Mr. Mann also owns a rental property in Indio, California (rental property or host property 2).  With Mr. Salveson's assistance, Mr. Mann filed an application with the local utility company for an interconnection agreement on March 1, 2010.  On July 8, 2010, Mr. Mann received a permit from the City of Indio to install a "solar system" on the rental property.

Mr. Mann and Mr. Salveson's LLC entered into a PPA dated August 1, 2010, with terms nearly identical to those of the PPA for host property 1:  (1) the LLC would sell Mr. Mann electricity from solar equipment it installed on the rental property; (2) Mr. Mann would receive discounted electricity for a five-year term while the LLC would retain ownership of the solar equipment and the right to any tax or other financial benefits; (3) Mr. Mann could not assign the agreement to

---

[3] Once connected to the grid, the solar equipment could send excess energy to the utility company.  This process, called "net metering", facilitates keeping the cost of the solar-generated electricity low.

[*6] another party without the LLC's consent, but the LLC could do so with 30 days' notice; and (4) the LLC would remain responsible for servicing and repairing the solar equipment.

On a date not established by the record, Mr. Salveson installed the solar equipment on the rental property. On September 20, 2010, a utility company representative signed the interconnection agreement and agreed to connect the rental property solar equipment to the electric grid. As a precondition Mr. Mann was required to install a bidirectional meter. That same day the utility company issued a letter to Mr. Mann stating that he was entitled to a rebate of $21,658.73. Mr. Mann assigned the rebate to Mr. Salveson's LLC.

Host Property 3

Scott and Betty Fisher own a residential property in La Quinta, California (residential property or host property 3). With Mr. Salveson's assistance, the Fishers filed an application with the local utility company for an interconnection agreement on March 1, 2010.

The Fishers entered into a PPA with Mr. Salveson's LLC on July 1, 2010, with terms nearly identical to those of the PPAs for host properties 1 and 2: (1) the LLC would sell the Fishers electricity from solar equipment it installed on the residential property; (2) the Fishers would receive discounted electricity for a five-

**[*7]** year term while the LLC would retain ownership of the solar equipment and the right to any tax or other financial benefits; (3) the Fishers could not assign the agreement to another party without the LLC's consent, but the LLC could do so with 30 days' notice; and (4) the LLC would remain responsible for servicing and repairing the solar equipment.

Mr. Salveson installed the solar equipment on the residential property in November 2010. On December 30, 2010, a utility company representative signed the interconnection agreement and agreed to connect the residential property solar equipment to the electric grid. As a precondition the Fishers were required to install a bidirectional meter. That same day the utility company issued a letter to the Fishers stating that they were entitled to a rebate of $16,449.89. The Fishers assigned the rebate to Mr. Salveson's LLC.

Sale of Solar Equipment

In January 2011 Mr. Golan purchased the solar equipment for host properties 1, 2, and 3 from Mr. Salveson. The sale was effected by several documents including: (1) a Solar Project Asset Purchase Agreement between Mr. Golan and Mr. Salveson dated January 10, 2011 (purchase agreement);[4] (2) Mr.

---

[4] The PPAs indicate that Mr. Salveson's LLC owned the solar equipment. However, for reasons not explained in the record, the purchase agreement names

(continued...)

**[*8]** Golan's promissory note dated January 15, 2011; (3) Mr. Golan's Guaranty dated January 10, 2011; and (4) a Bill of Sale and Conveyance dated January 10, 2011 (bill of sale).

Under the purchase agreement Mr. Golan agreed to buy the solar equipment on host properties 1, 2, and 3, in addition to the rights and obligations under the corresponding PPAs.[5] The purchase agreement specified that the "original use" of the solar equipment "shall commence on or after the Closing Date." The stated purchase price was $300,000, which is the sum of (1) a $90,000 downpayment (due on the closing date); (2) a $57,750 credit for the rebates Mr. Mann and the Fishers had assigned to Mr. Salveson's LLC; and (3) Mr. Golan's promissory note in the principal amount of $152,250.

With respect to the promissory note, Mr. Golan promised to pay Mr. Salveson the principal amount with interest at 2% per annum. Described by Mr.

---

[4](...continued)
Mr. Salveson as the seller rather than the LLC. Neither party has argued that this discrepancy affects the outcome of this case.

[5] Technically Mr. Golan agreed to purchase the "Project Assets", a defined term meaning "[a]ny and all property, whether tangible or intangible * * * related to, or used in connection with the generation of electricity at * * * [host properties one, two, and three] pursuant to the PPA[s]". As defined in the purchase agreement, the term includes the solar equipment, the PPAs, and the rights to all revenues, tax benefits, and other benefits therefrom.

[*9] Salveson as a "cash flow" instrument, the note had a maturity date of January 14, 2041, but did not have a fixed payment amount. Instead it required Mr. Golan to pay towards the note all monthly revenue generated by the solar equipment. The note provided that the "total amount due * * * during any calendar month shall not exceed the amount of such [m]onthly [r]eceipts." If the accrued interest exceeded the monthly receipts in any month, the difference would be "carried forward and owed by * * * [Mr. Golan] in future months." Conversely, monthly receipts in excess of accrued interest and amortized principal would accelerate the loan's repayment.

The note was secured by the solar equipment, and, in the event of a default, Mr. Salveson agreed to seek recourse against the solar equipment before exercising any rights or remedies against Mr. Golan. However, the note also stated that Mr. Golan "shall be liable to pay any deficiency owed to * * * [Mr. Salveson] in the event * * * foreclosure and sale of the Project Assets is insufficient to pay all amounts owed to * * * [Mr. Salveson] under this Note." Mr. Golan also signed a guaranty, in which he agreed to pay Mr. Salveson the outstanding balance of the note in the event the "Borrower" failed to pay the note.[6]

---

[6] We infer that Mr. Golan's guaranty of his own note was an attempt to ensure that he would be personally liable for the amounts borrowed under the note.

[*10] In addition to the purchase agreement and promissory note, Mr. Golan and Mr. Salveson signed a bill of sale. In the bill of sale Mr. Salveson acknowledged that he had received "good and valuable consideration" and was "selling, assigning, and conveying to * * * [Mr. Golan] all right, title, and interest in and to the Project Assets".[7] In order to further evidence transfer of the solar equipment, Mr. Golan signed copies of the PPAs for host properties 1, 2, and 3. Although the PPAs were dated July 1, August 1, and July 1, 2010, respectively, Mr. Golan signed them in January 2011.[8]

After the Sale

After the January 2011 sale, on a date not established by the record, the utility company connected the solar equipment on host properties 1, 2, and 3 to the electric grid. The solar equipment started generating electricity, and Mr. Mann and the Fishers began making monthly payments pursuant to the PPAs.

---

[7] As described supra note 5, the term "Project Assets" refers to the solar equipment, the PPAs, and the rights to all revenues, tax benefits, and/or other benefits therefrom.

[8] The record also contains a Call Option Agreement between Mr. Golan and Mr. Salveson dated September 22, 2011. Therein Mr. Golan granted Mr. Salveson an option to purchase the solar equipment for the outstanding balance of the promissory note. The period during which Mr. Salveson could exercise the option commenced October 22, 2016, and ended on March 22, 2017. Neither party mentioned this agreement at trial or on brief.

[*11] Mr. Golan was unable to pay Mr. Salveson the $90,000 downpayment in 2011. Although Mr. Golan was in default of the purchase agreement, Mr. Salveson continued to honor his end of the contract. At Mr. Golan's direction, Mr. Mann and the Fishers made direct payments of their electricity bills to Mr. Salveson. Mr. Salveson credited these payments towards the promissory note, which was never amended to account for the unpaid downpayment.

Mr. Golan made partial payments toward the downpayment to Mr. Salveson of $75,000 and $5,000 in 2012 and 2013, respectively. Although Mr. Golan was still in default for the remaining $10,000, Mr. Salveson did not cancel the contract or otherwise assert any claims for breach of contract.

Petitioners' Tax Return

Certified public accountant (C.P.A.) Dennis Klarin prepared petitioners' 2011 joint income tax return.[9] Before preparing the return, Mr. Klarin met with Mr. Golan and Mr. Salveson on four separate occasions. During these meetings Mr. Klarin and Mr. Salveson extensively discussed Mr. Golan's investment in the solar equipment and the tax consequences thereof. Mr. Salveson also provided Mr. Klarin with copies of the above-referenced agreements and other documents.

---

[9] Mr. Klarin has prepared Mr. Golan's income tax returns since 1977.

[*12] Petitioners attached to their return a Schedule C, Profit or Loss From Business, on which Mr. Golan purported to be a "consultant" for "Golan Solar Energy Service". On the Schedule C petitioners reported no income, claimed various deductions, including depreciation of $255,000, and stated that they were using the cash method of accounting.[10] On a Form 4562, Depreciation and Amortization, petitioners specified that the $255,000 deduction was a "[s]pecial depreciation allowance for qualified property". Petitioners also attached to their return a Form 3468, Investment Credit, on which they claimed an energy credit of $90,000 (30% of $300,000).

Notice of Deficiency

After selecting petitioners' return for examination, respondent issued petitioners a notice of deficiency. Therein respondent disallowed petitioners' special allowance for depreciation, stating: "We have disallowed the deduction you claimed for a Section 179 expense because the property does not qualify as Section 179 property."[11] Respondent also disallowed petitioners' energy credit,

---

[10] The $255,000 figure is the difference between $300,000, petitioners' purported basis in the solar equipment, and $45,000. Because petitioners also claimed an energy credit of $90,000, they were required to reduce their basis in the solar equipment by $45,000 pursuant to sec. 50(c)(1) and (3)(A).

[11] Respondent disallowed all other Schedule C deductions for "Golan Solar
(continued...)

**[\*13]** stating: "Your expenses do not qualify for the Rehabilitation Credit shown on Form 3468." In addition, respondent determined that petitioners were liable for an accuracy-related penalty under section 6662(a).[12]

OPINION

I.    <u>Burden of Proof</u>

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving it incorrect. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[13]

An exception to the general rule exists when the Commissioner raises a new matter. Rule 142(a); <u>Shea v. Commissioner</u>, 112 T.C. 183, 197 (1999); <u>Tabrezi v. Commissioner</u>, T.C. Memo. 2006-61. Generally, the Commissioner has raised a

---

[11](...continued)
Energy Service". Although in their petition, petitioners challenged the disallowance of these expenses, they did not mention them at trial or on brief. We therefore deem this issue abandoned and sustain respondent's determination as to these deductions. See <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 683 (1989); <u>Money v. Commissioner</u>, 89 T.C. 46, 48 (1987).

[12] Other than the adjustment respondent has conceded, <u>see</u> <u>supra</u> note 2, the remaining adjustments are computational and will be resolved under Rule 155.

[13] Sec. 7491(a) shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain preliminary conditions. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 442-443 (2001). Petitioners did not establish that sec. 7491(a) should apply to the instant case.

**[\*14]** new matter when the Commissioner "attempts to rely on a basis that is beyond the scope of the original deficiency determination". Shea v. Commissioner, 112 T.C. at 191. In particular, a new matter is raised when the Commissioner's new theory "either alters the original deficiency or requires the presentation of different evidence." Id. (quoting Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989)). The Commissioner generally must bear the burden of proof on a new matter. Rule 142(a); Shea v. Commissioner, 112 T.C. at 191.

In the notice of deficiency respondent disallowed petitioners' special allowance for depreciation because the solar equipment was not "Section 179 property". Respondent disallowed petitioners' energy credit because their expenses did "not qualify for the Rehabilitation Credit" under section 47. Given that petitioners did not claim a section 179 deduction or a section 47 rehabilitation credit on their return, respondent's references to these sections were in error. Respondent now acknowledges that sections 179 and 47 are inapplicable to this case.

Respondent nevertheless maintains that petitioners cannot claim the special allowance for depreciation or the energy credit. On brief respondent asserts the following grounds for his position: (1) petitioners failed to establish a basis in the

**[\*15]** solar equipment; (2) petitioners have not satisfied certain requirements of section 168(k)(5); (3) petitioners did not have sufficient amounts at risk under section 465; and (4) losses and credits attributable to Mr. Golan's solar energy venture are subject to the passive activity loss limitations of section 469.

We first address respondent's failure-to-establish-basis theory.[14] There is nothing in the notice of deficiency that indicates respondent was disputing the amount or existence of petitioners' basis in the solar equipment. Since this theory necessitates additional evidence regarding the cost of the solar equipment, it is a new matter for which respondent bears the burden of proof. See Rule 142(a); Shea v. Commissioner, 112 T.C. at 191, 197.

With respect to respondent's second theory, the deficiency notice does not mention section 168(k)(5) or otherwise state that petitioners failed to satisfy that provision's requirements.[15] For property to qualify for a 100% special depreciation allowance under section 168(k)(5), the taxpayer must acquire the

_____

[14] Respondent first raised this issue in his pretrial memorandum, which was filed several weeks before trial. Petitioners have neither argued nor established that the trial of this issue unfairly prejudiced them. See Niemann v. Commissioner, T.C. Memo. 2016-11, at \*14-\*15. We therefore find that the issue was tried by consent. See Rule 41(b).

[15] Respondent first disputed petitioners' entitlement to a sec. 168(k) special depreciation allowance in his answer to petitioners' amendment to petition.

**[\*16]** property after September 8, 2010, and before January 1, 2012. Additionally, the original use of the property must commence with the taxpayer after December 31, 2007. Section 179, which respondent erroneously referenced in the notice of deficiency, does not have these requirements. Because petitioners would need to introduce additional evidence of the purchase date and the property's original use, respondent's second theory is a new matter for which respondent bears the burden of proof. See Rule 142(a); Shea v. Commissioner, 112 T.C. at 191, 197.

The same goes for respondent's reliance on the at-risk rules of section 465, which generally requires a taxpayer to deduct losses only to the extent he is economically or actually at risk for the investment.[16] The notice of deficiency does not mention section 465. Because this theory necessitates additional evidence pertaining to Mr. Golan's financing of the solar equipment, it is a new matter for which respondent bears the burden of proof. See Rule 142(a); Shea v. Commissioner, 112 T.C. at 191, 197.

---

[16] Respondent first raised this issue in his pretrial memorandum, which was filed several weeks before trial. Petitioners have neither argued nor established that the trial of this issue unfairly prejudiced them. See Niemann v. Commissioner, at \*14-\*15. We therefore find that the issue was tried by consent. See Rule 41(b).

[*17] Respondent's reliance on the passive activity loss limitations of section 469 is also a new matter.[17]  Section 469 generally limits deductions for business activities in which the taxpayer does not materially participate.  As discussed infra, a taxpayer generally proves material participation by establishing, inter alia, that he participated in the activity for a specified number of hours.  See, e.g., Kline v. Commissioner, T.C. Memo. 2015-144, at *18-*19.  The deficiency notice does not mention section 469 or question the amount of time Mr. Golan spent on his solar energy venture.  Because this theory requires additional evidence of the amount of time Mr. Golan participated in his solar energy venture, it is a new matter for which respondent bears the burden of proof.  See Rule 142(a); Shea v. Commissioner, 112 T.C. at 191, 197.

Having assigned the burden of proof, we turn to an analysis of the applicable law as it relates to the issues presented.

_____

[17]  Respondent first raised this issue in his pretrial memorandum, which was filed several weeks before trial.  Petitioners have neither argued nor established that the trial of this issue unfairly prejudiced them.  See Niemann v. Commissioner, at *14-*15.  We therefore find that the issue was tried by consent. See Rule 41(b).

[*18] II.     Petitioners' Basis in the Solar Equipment

We first decide whether and to what extent petitioners have a basis in the solar equipment.  For the reasons stated supra part I, respondent bears the burden of proof.

The allowance of depreciation and the energy credit are both dependent on a taxpayer having a basis in the property.  See secs. 38(b)(1), 46, 48(a)(1) (energy credit), secs. 167(c)(1), 1011(a), 1012 (depreciation); see also Zirker v. Commissioner, 87 T.C. 970, 979 (1986); sec. 1.168(k)-1(a)(2)(iii), Income Tax Regs.  The taxpayer's basis in property is generally a question of fact.  See Bryant v. Commissioner, 790 F.2d 1463, 1465 (9th Cir. 1986), aff'g Webber v. Commissioner, T.C. Memo. 1983-633; Biltmore Homes, Inc. v. Commissioner, 288 F.2d 336, 341-342 (4th Cir. 1961), aff'g T.C. Memo. 1960-53; Wilson v. Commissioner, T.C. Memo. 1996-418.

Under section 1012 basis is generally the property's cost.  "Cost" is any "amount paid for such property in cash or other property."  Sec. 1.1012-1(a), Income Tax Regs.  Although cost basis generally equals the price paid for property, irrespective of its actual value, this rule might not apply "where a transaction is based upon 'peculiar circumstances' which influence the purchaser

[*19] to agree to a price in excess of the property's fair market value." Lemmen v. Commissioner, 77 T.C. 1326, 1348 (1981) (quoting Bixby v. Commissioner, 58 T.C. 757, 776 (1972)) (holding that a taxpayer's basis in a cattle herd was limited to its fair market value at the time of purchase where excess purchase price was allocable to maintenance contracts).

Cost generally includes promissory notes issued in exchange for property. Commissioner v. Tufts, 461 U.S. 300, 307-308 (1983); Crane v. Commissioner, 331 U.S. 1 (1947); see sec. 1.1012-1(g), Income Tax Regs. However, when a transaction is structured so that, taking economic realities into account, there is no realistic expectation that the taxpayer will repay the entire nominal debt, the amount recognized as actual debt should be limited accordingly. See Bridges v. Commissioner, 39 T.C. 1064, 1077 (1963) ("While it is true that technically petitioner was personally obligated on his note * * * there was no reason to think that petitioner could or would have been called upon to pay the note out of his own funds[.]"), aff'd, 325 F.2d 180 (4th Cir. 1963); Roe v. Commissioner, T.C. Memo. 1986-510, 52 T.C.M. (CCH) 778 (1986) (discussing cases in which recourse notes have been held not to be genuine indebtedness for purposes of determining basis in acquired property), aff'd without published opinion sub nom.

[*20] Haag v. Commissioner, 855 F.2d 855 (8th Cir. 1988), and aff'd without published opinion sub nom. Sincleair v. Commissioner, 841 F.2d 394 (5th Cir. 1988).

For purposes of calculating the special allowance and energy credit, petitioners reported a basis in the solar equipment of $300,000. This amount is the sum of the following: (1) the $90,000 downpayment; (2) the $57,750 credit for the utility company rebates the host property owners assigned to Mr. Salveson's LLC; and (3) the $152,250 principal amount of Mr. Golan's promissory note. Respondent argues that petitioners did not have a basis in the solar equipment for 2011 because no money changed hands between Mr. Golan and Mr. Salveson that year.

We first address the $90,000 downpayment. The record establishes that Mr. Golan did not pay anything towards the downpayment in 2011. Accordingly, there was no payment in cash or other property during 2011, and petitioners cannot add the downpayment to their basis for that year. See sec. 1.1012-1(a), Income Tax Regs.

We also agree with respondent with respect to the $57,750 credit. The record establishes the host property owners assigned the utility company rebates to Mr. Salveson's LLC prior to the sale of the solar equipment. Mr. Golan neither

[*21] received nor reported the rebates as income. We therefore find on the record before us that the credit was really a price reduction to account for the LLC's receipt of the rebates prior to the sale of the solar equipment to Mr. Golan. Because the rebates were not part of the solar equipment's cost to Mr. Golan, petitioners cannot add the $57,750 credit to their basis in the solar equipment. See sec. 1012; sec. 1.1012-1(a), Income Tax Regs.

We reach a different conclusion with respect to Mr. Golan's $152,250 promissory note. Mr. Golan's recourse note was issued in exchange for the solar equipment; petitioners can therefore include the face amount of the note in their basis. See Commissioner v. Tufts, 461 U.S. at 307-308; Crane v. Commissioner, 331 U.S. at 11; see also sec. 1.1012-1(g), Income Tax Regs. Respondent has not argued that Mr. Golan cannot reasonably be expected to repay the face amount of the note.[18] See Bridges v. Commissioner, 39 T.C. at 1077; Roe v. Commissioner, T.C. Memo. 1986-510. Nor has respondent introduced credible evidence that the solar equipment was overvalued. See Lemmen v. Commissioner, 77 T.C. at 1348.

---

[18] Respondent does not contend that Mr. Golan's promissory note to Mr. Salveson was, or should be treated as, nonrecourse debt. Cf. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976) (holding that nonrecourse debt used to acquire property was not true indebtedness to the extent it exceeded the property's fair market value), aff'g 64 T.C. 752 (1975); see also Odend'hal v. Commissioner, 80 T.C. 588 (1983), aff'd, 748 F.2d 908 (4th Cir. 1984).

**[\*22]** Accordingly, we find that petitioners' basis in the solar equipment for 2011 was $152,250.

III.    Section 168(k)

We next decide whether petitioners are entitled to a special allowance for depreciation under section 168(k). For the reasons stated supra part I, respondent bears the burden of proof.

Section 167 allows a deduction for the exhaustion and wear and tear of property used in a trade or business or held for the production of income.[19] To determine the annual wear and tear of tangible property, the Code generally requires taxpayers to use the modified accelerated cost recovery system (MACRS) outlined in section 168. Under section 168(k)(1)(A), the depreciation deduction provided by section 167 includes a special allowance for qualified property "for the taxable year in which such property is placed in service". The special allowance is a percentage of the property's adjusted basis; the amount of the percentage generally depends on when the property was acquired and placed in service.

---

[19] Respondent's opening brief includes the following requested finding of fact: "Mr. Golan was interested in investing in the solar property because it would take very little time and would provide him with income." We construe this requested finding of fact as a concession that Mr. Golan held the solar equipment for the production of income pursuant to sec. 167.

**[*23]** Section 168(k)(5) provides for a special allowance of 100% of the adjusted basis of certain qualified property. For purposes of section 168(k)(5), qualified property is property that meets the following requirements: (1) the property was MACRS property with an applicable recovery period of 20 years or less, unless it was certain computer software, water utility property, or qualified leasehold improvement property; (2) the original use of the property commenced with the taxpayer after December 31, 2007; (3) the taxpayer acquired the property after September 8, 2010, and before January 1, 2012; and (4) the taxpayer placed the property in service before January 1, 2012. Although he appears to concede that petitioners met the first and second of these requirements,[20] respondent contends that petitioners failed to satisfy the third and fourth requirements.

We start with the third requirement, namely, that the taxpayer acquire the property after September 8, 2010, and before January 1, 2012. Respondent argues that, because Mr. Salveson installed the solar panels on two of the host properties

---

[20] Respondent does not address these requirements on brief. See Muhich v. Commissioner, 238 F.3d 860, 864 n.10 (7th Cir. 2001) (holding that issues not addressed or developed on brief are deemed waived; it is not the Court's obligation to research and construct the parties' arguments), aff'g T.C. Memo. 1999-192; 330 W. Hubbard Rest. Corp. v. United States, 203 F.3d 990, 997 (7th Cir. 2000) (same); Larson v. Northrop Corp., 21 F.3d 1164, 1168 n.7 (D.C. Cir. 1994) (declining to reach issues neither argued nor briefed); Jafarpour v. Commissioner, T.C. Memo. 2012-165 (same).

[*24] in the summer of 2010, he must have acquired them before September 8, 2010. However, section 168(k)(5) applies to "property <u>acquired by the taxpayer</u> * * * after September 8, 2010". (Emphasis added.) Respondent has not cited, and we have not found, any authority for the proposition that the special allowance is available only to the original purchasers of manufactured property.[21] <u>See also</u> sec. 1.168(k)-1(b)(3)(ii)(B), Income Tax Regs. ("If a person initially acquires new property and holds the property primarily for sale to customers in the ordinary course of the person's business and a taxpayer subsequently acquires the property * * * primarily for the taxpayer's production of income, the taxpayer is considered the original user[.]"). Since the record establishes that Mr. Golan acquired the solar equipment in January 2011, we find that the solar property was "acquired by the taxpayer * * * after September 8, 2010, and before January 1, 2012". <u>See</u> sec. 168(k)(5).

---

[21] To be sure, if Mr. Salveson or anyone else had used the solar equipment prior to Mr. Golan's acquisition of it, petitioners would not be entitled to the special allowance. <u>See</u> sec. 168(k)(2)(A)(ii) (original use requirement); <u>Weekend Warrior Trailers, Inc. v. Commissioner</u>, T.C. Memo. 2011-105; sec. 1.168(k)-1(b)(3)(i), Income Tax Regs. ("[O]riginal use means the first use to which the property is put[.]"). As explained <u>supra</u> note 20, respondent did not address the "original use" requirement of sec. 168(k) on brief. Even if respondent had done so, the record does not establish that anyone used the solar equipment prior to Mr. Golan.

[*25] Respondent also questions whether petitioners satisfied the fourth requirement, namely, that the solar equipment was placed in service before January 1, 2012. Before we address respondent's argument, we will briefly summarize the placed-in-service rules.

"Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function". Sec. 1.167(a)-11(e)(1)(i), Income Tax Regs. We have held that property is not placed in service until it is ready and available for full operation on a regular basis for its intended use. Brown v. Commissioner, T.C. Memo. 2013-275, at *31-*32, *36 (citing Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987)). For example, in Brown v. Commissioner, T.C. Memo. 2013-275, the taxpayer sought a section 168(k) special allowance for an airplane he purchased in 2003. He took delivery of the plane in December 2003 but insisted that the plane undergo various modifications so that it could serve his particular business needs. Although the plane was fully functional and available to the taxpayer in December 2003, we held that it was first placed in service in January 2004 upon the completion of the modifications. We reasoned that, until the modifications were complete, the taxpayer could not use the plane as he had intended for his particular business needs.

**[*26]** With these principles in mind, we return to respondent's argument. Respondent argues that, because Mr. Salveson installed the solar panels on the host properties in 2010, they were placed in service in 2010.[22] We disagree. Section 168(k)(5) applies to property "placed in service <u>by the taxpayer</u> before January 1, 2012". (Emphasis added.) Given that Mr. Golan did not purchase the solar property until January 2011, we fail to see how the property was ready and available to him for full operation on a regular basis in 2010. See <u>Brown v. Commissioner</u>, at *31-*32, *36.

Furthermore, there is no evidence that the solar equipment was placed in service by anyone before 2011. The record establishes that the intended use of the solar property was the provision of discounted electricity through a net metering arrangement with the utility company. Accordingly, the solar equipment needed to be connected to the electric grid. The utility company agreed to the interconnection for one of the host properties on September 20, 2010. With

---

[22] In order to qualify for the sec. 168(k)(5) special allowance for the year in issue, Mr. Golan needed to place the solar property in service in 2011. <u>See</u> sec. 168(k)(1)(A) (authorizing the special allowance "for the taxable year in which such property is placed in service"); sec. 1.168(k)-1(d)(1), Income Tax Regs. (the special allowance "is allowable in the first taxable year in which the qualified property * * * is placed in service by the taxpayer * * * for the production of income."); <u>see also</u> Rev. Proc. 2008-54, 2008-2 C.B. 722 (rules similar to the rules in sec. 1.168(k)-1 for "qualified property" apply for purposes of sec. 168(k) as presently in effect).

[*27] respect to the other two host properties, the utility company agreed to the interconnection on December 30, 2010. Each of the three interconnection agreements required, as a precondition to connecting the solar equipment to the electric grid, the installation of a bidirectional meter. However, the precise dates of each bidirectional meter's installation and the interconnection with the electric grid are unclear.

On the basis of these facts, we conclude that the solar equipment was not ready and available for full operation on a regular basis for its intended use until it was connected to the electric grid. It is respondent's burden to show the solar equipment was connected to the electric grid before 2011, and he has not done so.[23] The foregoing considered, we hold that Mr. Golan placed the solar equipment in service in 2011 and that petitioners satisfied the requirements of 168(k)(5).

IV. Section 465

We next decide whether petitioners were at risk under section 465 with respect to Mr. Golan's $152,250 promissory note. For the reasons stated supra part I, respondent bears the burden of proof.

---

[23] From the testimony at trial, we believe the solar equipment began providing electricity to the host properties in 2011.

[*28] Section 465 limits a taxpayer's loss deductions only to those amounts for which the taxpayer is at risk with respect to the activity. A taxpayer is at risk to the extent of any money and the adjusted basis of any property contributed to the activity. Sec. 465(b)(1)(A). A taxpayer also is generally considered to be at risk to the extent that he is personally liable for the repayment of amounts borrowed for use in the activity. Sec. 465(b)(2)(A). For purposes of the at-risk rules, however, amounts borrowed from any person having an interest in the activity (other than an interest as a creditor) are not considered to be at risk. Sec. 465(b)(3).[24]

The regulations provide that a person has a prohibited continuing interest under section 465(b)(3) "only if the person has either a capital interest in the activity or an interest in the net profits of the activity." Sec. 1.465-8(b)(1), Income Tax Regs. A capital interest is defined as "an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity." Id. subpara. (2).

---

[24] Sec. 465(b)(4) provides that "a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Because respondent did not address the applicability of this provision on brief, we deem it waived. See Muhich v. Commissioner, 238 F.3d at 864 n.10; 330 W. Hubbard Rest. Corp., 203 F.3d at 997; Northrop Corp., 21 F.3d at 1168 n.7; Jafarpour v. Commissioner, slip op. at 11 n.13.

**[\*29]** A person may have an interest in the net profits of an activity even though he does not possess any incidents of ownership in the activity. Id. subpara. (3). For example, an employee or independent contractor whose compensation is wholly or partially determined with reference to the net profits of the activity is considered to have an interest in the net profits of the activity. Id. Conversely, an employee or independent contractor whose compensation is based on the gross receipts of the activity would not be regarded as having a prohibited continuing interest. See id. subpara. (4), Example (2).

Section 465(b)(3) contemplates fixed and definite rights or interests that realistically may cause creditors to act contrary to how independent creditors would act with respect to their rights under the debt obligations in question.[25] Levy v. Commissioner, 91 T.C. 838, 868 (1988). That a creditor was a promoter

---

[25] Much of our caselaw on this provision predates the issuance of final regulations interpreting sec. 465(b)(3) in May 2004. See T.D. 9124, 2004-1 C.B. 901. However, the current definitions of a "capital interest" and "an interest in net profits" are nearly identical to those in proposed regulations issued by the Secretary in 1979. See sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). We have used the text of the proposed regulations as a guideline in determining whether creditors in transactions had prohibited continuing interests. See Levy v. Commissioner, 91 T.C. 838, 867 (1988); Larsen v. Commissioner, 89 T.C. 1229, 1270 (1987), aff'd on this issue sub nom. Casebeer v. Commissioner, 909 F.2d 1360, 1364-1365 (9th Cir. 1990); Jackson v. Commissioner, 86 T.C. 492, 529 (1986), aff'd, 864 F.2d 1521 (10th Cir. 1989). Thus, our pre-2004 caselaw remains useful in interpreting and applying the final regulations.

[*30] with respect to a particular transaction does not necessarily mean that he has a prohibited continuing interest in the transaction. Krause v. Commissioner, 92 T.C. 1003, 1024 (1989). We apply these rules to the facts of a transaction as they exist at the end of each taxable year. Id. at 1025; see also sec. 465(a)(1).

Respondent contends that Mr. Salveson had a prohibited continuing interest in the solar equipment activity under section 465(b)(3). We disagree. Respondent has not identified any provision of Mr. Golan's and Mr. Salveson's agreement under which Mr. Salveson would be entitled to the assets of Mr. Golan's solar energy venture upon its liquidation. See sec. 1.465-8(b)(2), Income Tax Regs. Nor has respondent shown that Mr. Salveson had an interest in the net profits of Mr. Golan's solar energy venture.[26] See id. subpara (3). To be sure, the promissory note requires Mr. Golan to pay Mr. Salveson all monthly revenue generated by the solar equipment towards the note. However, Mr. Salveson's right to all monthly revenue is a gross receipts interest, which the regulations permit. See id. subpara (4), Example (2).

---

[26] As stated supra note 8, Mr. Salveson had an option to repurchase the solar equipment for a five-month period commencing October 22, 2016. Neither party mentioned the existence of the option at trial or on brief. We deem respondent's failure to address the option as a concession that it was not a prohibited continuing interest. See Muhich v. Commissioner, 238 F.3d at 864 n.10; 330 W. Hubbard Rest. Corp., 203 F.3d at 997; Northrop Corp., 21 F.3d at 1168 n.7; Jafarpour v. Commissioner, slip op. at 11 n.13.

[*31] We therefore hold that Mr. Salveson did not have a prohibited continuing interest in the solar equipment activity under section 465(b)(3). The fact that Mr. Salveson may have been a promoter of the transaction does not change this result. See Krause v. Commissioner, 92 T.C. at 1024. Accordingly, because respondent has failed to show otherwise, we hold that petitioners were at risk with respect to Mr. Golan's $152,250 promissory note.

## V.    Section 469

We next address whether petitioners' loss and credit attributable to Mr. Golan's solar energy venture are subject to the passive activity loss limitations of section 469. For the reasons stated supra part I, respondent bears the burden of proof.

Section 469 generally prohibits using a loss from a passive activity to reduce income from nonpassive activities during any taxable year.[27] Sec. 469(a), (d)(1). In general, a passive activity is a trade or business in which the taxpayer

---

[27] Losses from a passive activity are generally allowed in the year they are sustained only to the extent of passive activity income. Sec. 469(a)(1)(A), (d)(1). Credits attributable to a passive activity are generally allowed only to the extent of the taxpayer's regular tax liability for the year with respect to all passive activities. Sec. 469(a)(1)(B), (d)(2).

[*32] does not materially participate.[28]  Sec. 469(c)(1).  A taxpayer materially participates in an activity when he is involved in the activity on a regular, continuous, and substantial basis.  Sec. 469(h)(1).  Participation generally means all work done in connection with an activity by an individual who owns an interest in the activity.  Sec. 1.469-5(f), Income Tax Regs.

A taxpayer can establish material participation by satisfying any one of seven tests provided in the regulations.  Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988); see, e.g., Miller v. Commissioner, T.C. Memo. 2011-219.  Of these, petitioners assert that the following test is relevant to this case:

> (3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

Sec. 1.469-5T(a)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

---

[28]  A passive activity generally includes any rental activity.  Sec. 469(c)(2).  The Code defines a rental activity as any activity where payments are principally for the use of tangible property.  Sec. 469(j)(8).  Respondent does not contend that Mr. Golan's arrangement with the host property owners was a rental activity.

[*33] Petitioners maintain that Mr. Golan participated in his solar energy venture for at least 100 hours in 2011 and that his participation was not less than that of any other individual.[29] Respondent, who bears of burden of proof, has not established otherwise. We therefore find that petitioners are not subject to the passive activity loss limitations with respect to Mr. Golan's solar energy venture for 2011.

## VI.    Accuracy-Related Penalty

Finally we consider whether petitioners are liable for an accuracy-related penalty under section 6662(a). Petitioners argue that they should not be liable for the penalty because they acted on the advice of their return preparer. Respondent argues that he met his burden of production with respect to the penalty and that petitioners have not established that they acted with reasonable cause in relying on their return preparer.

Section 6662(a) and (b)(2) provides that taxpayers will be liable for a penalty equal to 20% of the portion of an underpayment of tax attributable to a substantial understatement of income tax. Section 6662(d)(1)(A) provides that an

---

[29] We found Mr. Golan's testimony credible. See Diaz v. Commissioner, 58 T.C. 560, 564 (1972) (stating that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, "is the daily grist of judicial life").

**[\*34]** understatement of income tax is substantial if the amount of the understatement exceeds the greater of (1) 10% of the tax required to be shown on the return or (2) $5,000.

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer shows that he acted with reasonable cause and good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. 438, 448 (2001). Generally, the most important factor is the extent of the taxpayer's effort to assess his proper tax liability. Humphrey, Farrington & McClain, P.C. v. Commissioner, T.C. Memo. 2013-23; sec. 1.6664-4(b)(1), Income Tax Regs. Reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding liability for the section 6662(a) penalty. See United States v. Boyle, 469 U.S. 241, 250-251 (1985). Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all the facts and circumstances. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

This Court has stated that reasonable cause and good faith are present where the record establishes by a preponderance of the evidence that: (1) the taxpayer reasonably believes that the professional upon whom the reliance is placed is a

**[\*35]** competent tax adviser who has sufficient expertise to justify reliance; (2) the taxpayer provides necessary and accurate information to the adviser; and (3) the taxpayer actually relies in good faith on the adviser's judgment. Id. at 99.

The Commissioner bears the initial burden of production. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447. The Commissioner's burden of production under section 7491(c) includes establishing compliance with the supervisory approval requirement of section 6751(b).[30] Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 14) (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016); see also Chai v. Commissioner, 851 F.3d 190, 222 (2d Cir. 2017) (citing Higbee v. Commissioner, 116 T.C. at 446). If the Commissioner satisfies his burden, the taxpayer then bears the ultimate burden of persuasion. Higbee v. Commissioner, 116 T.C. at 446-447.

Assuming (without finding) that respondent has met his burden of production in the instant case, we nevertheless conclude that petitioners carried their burden with respect to reasonable cause and good faith.[31]

---

[30] Sec. 6751(b) requires written supervisory approval of the initial determination of certain penalties.

[31] Because we hold that petitioners acted in good faith and with reasonable cause, we need not decide whether respondent carried his burden of production under sec. 7491(c).

**[\*36]** Mr. Klarin, petitioners' C.P.A., prepared their 2011 joint Federal income tax return.  On the basis of the record before us, we find that Mr. Klarin had sufficient expertise to justify petitioners' reliance, that petitioners provided him with necessary and accurate information, and that petitioners relied upon him in good faith.  At trial respondent's counsel acknowledged that Mr. Klarin is a "qualified professional".  We view this statement as a concession that Mr. Klarin had sufficient expertise to justify petitioners' reliance.  Furthermore,  Mr. Klarin credibly testified that he met with Mr. Golan to discuss the solar venture on at least four occasions and that petitioners provided him with all the information he needed to prepare their return.  We are also satisfied from Mr. Golan's credible testimony that petitioners relied on Mr. Klarin in good faith.

In sum, the record as a whole establishes that petitioners made a good faith effort to assess their proper tax liability and reasonably relied on the advice of their return preparer.  We therefore hold that petitioners are not liable for the accuracy-related penalties.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

**[*37]** To reflect the foregoing,

Decision will be entered under

Rule 155.
